**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KELLY BROUSSARD; JIM STEPHENS;
MARK ZUCKERMAN; ARNOLD FISCHTHAL;
JOHN HAGAR; VINCENT MATERA; DENIS
WICKHAM; MARY ANN WICKHAM;
KENEX CORPORATION; RALPH YARUSSO,
Plaintiffs-Appellees,

v.

MEINEKE DISCOUNT MUFFLER SHOPS,
INCORPORATED; NEW HORIZONS
ADVERTISING, INCORPORATED; GKN
PARTS INDUSTRIES; GKN, plc; RONALD
SMYTHE; GENE ZHISS; TED PEARCE,
Defendants-Appellants,

and                                                              No. 97-1808

MICHIGAN FRANCHISEES, which consists

of: Peter D. Beyer, Ronald S. Slack,
Susan I. Slack, Sherman J. Radford,
Jayne Radford, William J. Varney,
Sr., William J. Varney, Jr., Sher-Jay
and Sons, Incorporated, and
M.A.T.M., Incorporated,
Defendant.

ATL INTERNATIONAL, INCORPORATED;
BLIMPIE INTERNATIONAL, INCORPORATED;
BURGER KING CORPORATION; DOCTOR'S
ASSOCIATES, INCORPORATED;
FOODMAKER, INCORPORATED; GOLDEN
CORRAL CORPORATION; HARDEE'S FOOD
SYSTEMS, INC.; INTERNATIONAL DAIRY
QUEEN, INCORPORATED; MCDONALD'S
CORPORATION; MOBIL OIL CORPORATION;

THE SOUTHLAND CORPORATION;
SECRETARY OF COMMERCE OF THE
STATE OF NORTH CAROLINA; AMERICAN
COUNCIL OF LIFE INSURANCE; SECURITIES
INDUSTRY ASSOCIATION; BRITISH
AMERICAN BUSINESS COUNCIL OF NORTH
CAROLINA, INCORPORATED; AMERICAN
ASSOCIATION OF FRANCHISEES AND
DEALERS; AMERICAN FRANCHISEE
ASSOCIATION; SAL LOBELLO; GOODWIN
MANAGEMENT GROUP, INC.; STEVEN D.
LOYE FAMILY LIMITED PARTNERSHIP;
PS&F ENTERPRISES INC.; STEPHEN
PARASCONDOLA; ROBERT OTT,
Amici Curiae.

KELLY BROUSSARD; JIM STEPHENS;
MARK ZUCKERMAN; ARNOLD FISCHTHAL;
JOHN HAGAR; VINCENT MATERA; DENIS
WICKHAM; MARY ANN WICKHAM;
KENEX CORPORATION; RALPH YARUSSO,
Plaintiffs-Appellants,

v.

No. 97-1848

MEINEKE DISCOUNT MUFFLER SHOPS,
INCORPORATED; NEW HORIZONS
ADVERTISING, INCORPORATED; GKN
PARTS INDUSTRIES; GKN, plc; RONALD
SMYTHE; GENE ZHISS; TED PEARCE,
Defendants-Appellees,

and

2

MICHIGAN FRANCHISEES, which consists
of: Peter D. Beyer, Ronald S. Slack,
Susan I. Slack, Sherman J. Radford,
Jayne Radford, William J. Varney,
Sr., William J. Varney, Jr., Sher-Jay
and Sons, Incorporated, and
M.A.T.M., Incorporated,
<u>Defendant.</u>

ATL INTERNATIONAL, INCORPORATED;
BLIMPIE INTERNATIONAL, INCORPORATED;
BURGER KING CORPORATION; DOCTOR'S
ASSOCIATES, INCORPORATED;
FOODMAKER, INCORPORATED; GOLDEN
CORRAL CORPORATION; HARDEE'S FOOD
SYSTEMS, INC.; INTERNATIONAL DAIRY
QUEEN, INCORPORATED; MCDONALD'S
CORPORATION; MOBIL OIL CORPORATION;
THE SOUTHLAND CORPORATION;
SECRETARY OF COMMERCE OF THE
STATE OF NORTH CAROLINA; AMERICAN
COUNCIL OF LIFE INSURANCE; SECURITIES
INDUSTRY ASSOCIATION; BRITISH
AMERICAN BUSINESS COUNCIL OF NORTH
CAROLINA, INCORPORATED; AMERICAN
ASSOCIATION OF FRANCHISEES AND
DEALERS; AMERICAN FRANCHISEE
ASSOCIATION; SAL LOBELLO; ROBERT
OTT; STEPHEN PARASCONDOLA; PS&F
ENTERPRISES INC.; STEVEN D. LOYE
FAMILY LIMITED PARTNERSHIP; GOODWIN
MANAGEMENT GROUP, INC.,
<u>Amici Curiae.</u>

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-94-255-3-P)

3

Argued: May 5, 1998

Decided: August 19, 1998

Before WILKINSON, Chief Judge, and ERVIN and
MICHAEL, Circuit Judges.

_____

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Ervin and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Kenneth Winston Starr, KIRKLAND & ELLIS, Washington, D.C., for Appellants. Charles Justin Cooper, COOPER & CARVIN, P.L.L.C., Washington, D.C., for Appellees. **ON BRIEF:** Steven G. Bradbury, Christopher Landau, Adam G. Ciongoli, Brett M. Kavanaugh, KIRKLAND & ELLIS, Washington, D.C.; E. Osborne Ayscue, Jr., Catherine E. Thompson, Thomas D. Myrick, Corby C. Anderson, SMITH, HELMS, MULLISS & MOORE, L.L.P., Charlotte, North Carolina, for Appellants. Michael A. Carvin, Michael W. Kirk, R. Ted Cruz, COOPER & CARVIN, P.L.L.C.; James J. McCabe, John J. Soroko, Wayne A. Mack, Mark B. Schoeller, DUANE, MORRIS & HECKSCHER, Philadelphia, Pennsylvania; Thomas J. Ashcraft, Charlotte, North Carolina, for Appellees. Theodore B. Olson, Theodore J. Boutrous, Jr., Sean E. Andrussier, GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Amici Curiae ATL International, et al. Andrew A. Vanore, Jr., NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Amicus Curiae Secretary of Commerce. Phillip E. Stano, AMERICAN COUNCIL OF LIFE INSURANCE, Washington, D.C.; Stuart J. Kaswell, Fredda L. Plesser, SECURITIES INDUSTRY ASSOCIATION, New York, New York, for Amici Curiae American Council of Life Insurance, et al. Edgar Love, III, Kiran H. Mehta, Stanford D. Baird, KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina, for Amicus Curiae British American Business Council. Mario L. Her-

4

man, Washington, D.C.; J. Michael Dady, DADY & GARNER, P.A., Minneapolis, Minnesota, for Amici Curiae Association of Franchisees, et al. John K. Bush, Janet P. Jakubowicz, GREENEBAUM, DOLL & MCDONALD, P.L.L.C., Louisville, Kentucky, for Amici Curiae Lobello, et al.

_____

**OPINION**

WILKINSON, Chief Judge:

This case is a study in the tensions that can beset the franchisor-franchisee relationship. Ten owners of Meineke Discount Muffler franchises sued franchisor Meineke Discount Muffler Shops, Inc. ("Meineke"), Meineke's in-house advertising agency New Horizons Advertising, Inc. ("New Horizons"), three officers of Meineke, and Meineke's corporate parents GKN plc ("GKN") and GKN Parts Industries Corporation ("PIC"). Plaintiffs claimed that Meineke's handling of franchise advertising breached the Franchise and Trademark Agreements ("FTAs") that Meineke had entered into with every franchisee. Plaintiffs also advanced a raft of tort and statutory unfair trade practices claims arising out of the same conduct. The plaintiff-franchisees purported to advance these claims on behalf of a nation-wide class of current and former Meineke dealers. Plaintiffs won a $390 million judgment against Meineke and its affiliated parties.

On appeal, defendants maintain that the suit was erroneously certified as a class action and challenge several other legal rulings by the district court. Because the class the district court certified does not conform to the requirements of Federal Rule of Civil Procedure 23(a), we reverse the class certification. And because the class action posture, along with at least three fundamental legal errors, deprived defendants of a fair trial on the precise issue of contractual breach that is properly the focus of this case, we reverse the judgment below, vacate the award of damages, and remand the case for further proceedings consistent with this opinion.

I.

The plaintiff class consisted of "all persons or entities throughout the United States that were Meineke franchisees operating at any time

5

during or after May of 1986." As a Meineke franchisee, each putative class member is or has been a party to one or more FTAs with Meineke. FTAs expire after a fixed period, usually 15 years, at which point the franchise can be renewed or terminated. During the time relevant to this lawsuit, Meineke periodically revised the FTA, so several different versions of the contract are at issue in this action. Under all versions of the FTA, each franchisee was to pay Meineke an initial franchise fee (which is sometimes waived) and thereafter some percentage of its weekly gross revenue (generally 7-8%) as a royalty. Franchisees also paid Meineke ten percent of weekly revenues to fund national and local advertising. Initially, franchisees made these advertising contributions directly to a third-party advertising agency, M&N Advertising ("M&N"), which placed ads on a commission basis. After late 1982, franchisees paid their ten percent contributions to a central account maintained by Meineke, the Weekly Advertising Contribution ("WAC") account.

Franchise advertising is addressed in two sections of the FTAs. Among other things, Section 3.1 of all versions of the FTA obliges Meineke "[t]o purchase and place from time to time advertising promoting the products and services sold by FRANCHISEE." The FTAs provide that "all decisions regarding whether to utilize national, regional or local advertising, or some combination thereof, and regarding selection of the particular media and advertising content, shall be within the sole discretion of MEINEKE and such agencies or others as it may appoint." In FTAs executed from 1989 through 1991, Section 3.1 was introduced by a clause that indicated Meineke would provide the services identified in that section"[i]n consideration for the payment of Franchisee's initial license fee." However, until 1990, every FTA also provided that "MEINEKE agrees that it will expend for media costs, commissions and fees, production costs, creative and other costs of such advertising, with respect to MEINEKE franchisees, an amount equal to the total of all sums collected from all franchisees under and pursuant to Section 7.17 hereof." Section 7.17 of the FTA describes payments to the WAC account.

Three categories of disbursements from the WAC account, totaling approximately $32.2 million, are at the heart of this lawsuit. First, Meineke used just over $1.1 million of WAC funds to defend and settle a suit brought by M&N for past and future commissions when, in

6

1986, Meineke stopped doing business with M&N and established New Horizons to handle advertising placement in-house. As had M&N, New Horizons placed some advertisements on its own and engaged the services of outside agencies to place the rest. These outside agencies were paid a total of almost $14 million in commissions from the WAC account, the second category of disputed expenditures. Third, New Horizons itself was paid approximately $17.1 million in commissions from the WAC account for the advertisements it placed.

At a dealers' meeting in April 1993, a Meineke official read from a December 1992 Uniform Franchise Offering Circular ("UFOC") that disclosed New Horizons' 5-15% commission rates. Plaintiffs knew before the meeting that New Horizons took commissions from WAC funds but claim they were unaware that its rates were so high. As one of the named plaintiffs explained, he had not seen the UFOC in question "because I hadn't bought a shop in three or four years and . . . you don't get an offering circular unless you're buying a shop." Shortly after the meeting, plaintiffs filed this lawsuit, charging that Meineke had no right to pay New Horizons (or any other entity) any commissions from the WAC account for the purchase or placement of advertising. Rather, according to plaintiffs, WAC funds were to be used only to pay for the advertisements themselves, and Meineke was to perform the purchase and placement duty in return for franchisees' royalty fees. In addition to this alleged breach of the FTAs, plaintiffs charged Meineke and the other defendants variously with breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, unjust enrichment, negligence, negligent misrepresentation, intentional interference with contractual relations, and unfair and deceptive trade practices in violation of the North Carolina Unfair Trade Practices Act ("UTPA"), N.C. Gen. Stat. § 75-1.1.[1]

_____

[1] Plaintiffs' complaint also alleged violations of the analogous Texas Deceptive Trade Practices - Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41 et seq., and RICO, 18 U.S.C. §§ 1962(c) and (d). With respect to the Texas act, the district court ruled after trial that both North Carolina and Texas choice of law rules directed that only the North Carolina UTPA applies to this dispute, a ruling neither party challenges. The district court dismissed the RICO claims before trial, and plaintiffs do not press them on appeal.

In January 1995, Meineke offered all its franchisees a new franchise package, the Enhanced Dealer Program ("EDP"). In exchange for releasing Meineke from all claims arising out of past dealings, specifically including the claims at issue in this lawsuit, franchisees who accepted the EDP received a reduced royalty rate, a guaranteed reduction in New Horizons' commission rates, greater control over local advertising, and other benefits like a free computer system and the chance to obtain an additional franchise at a discount. Plaintiffs urged their fellow franchisees not to accept the EDP, warning that by doing so franchisees would be "signing away [their] rights to be in the class" and asserting that the EDP did "not go nearly far enough as a settlement offer" because it "ask[ed] franchisees to trade legal rights for too little change." Nevertheless, more than half of Meineke's existing franchisees accepted the EDP before the offer expired on March 15, 1995. No named plaintiff accepted the EDP.

On May 11, 1995, the district court certified a non-opt-out class of "all persons or entities throughout the United States that were Meineke franchisees operating at any time during or after May of 1986." The district court also disposed of numerous pretrial motions. Most relevant here, the court denied GKN's motion for summary judgment, holding that the issue of "piercing the corporate veil" to impose vicarious liability on GKN for the acts of its subsidiaries was one for the jury. The court denied two motions by Meineke to depose absent class members. And the court denied Meineke's motion to sever issues related to the EDP and other releases executed by franchisees.

Trial lasted seven weeks. The cornerstone of plaintiffs' contract case was language that appeared only in some versions of the FTA. And plaintiffs' tort and statutory unfair trade practices claims prominently featured 171 taped excerpts of statements made by Meineke representatives at so-called "final review sessions" that preceded the execution of any franchise agreement -- all but one of the sessions involving absent class members. Plaintiffs' expert outlined a damages formula, by which he purported to calculate the lost profits damages of all class members on a "global" basis. He testified that every Meineke franchisee lost $8.16 in sales for each dollar of allegedly misallocated WAC funds and projected a 34% profit margin for all franchisees. To show that Meineke, New Horizons, and PIC were

8

"mere instrumentalities" of their parent, plaintiffs introduced evidence that GKN was aware New Horizons was financed with WAC funds and that GKN secretly encouraged Meineke to maximize New Horizons' profitability. Meineke and the other defendants advanced a contrary interpretation of the FTAs, denied all wrongdoing, and denied that GKN had exercised control over its subsidiaries sufficient to justify veil-piercing. Defendants also interposed the defense of statute of limitations.

The jury returned a verdict against Meineke for breach of contract and against Meineke and New Horizons for breach of fiduciary duty, negligence, and unjust enrichment. The jury found that GKN and PIC had utilized Meineke and New Horizons as mere instrumentalities, and that PIC was merely an instrumentality of GKN, which justified piercing the corporate veil and imposing vicarious liability on GKN. Along with Meineke and New Horizons, GKN, PIC, and three officers of Meineke were found to have themselves committed fraud, made negligent misrepresentations, and violated the UTPA. The jury also found that New Horizons, GKN, PIC, and the three individual defendants were directly liable for aiding and abetting Meineke's and New Horizons' breach of fiduciary duty and for interfering with plaintiffs' contractual relations with Meineke. And the jury determined that none of plaintiffs' claims was barred by statutes of limitations ranging from three to ten years, finding that plaintiffs had no actual knowledge of the challenged conduct outside the various limitations period and/or ascribing any delay in filing suit to plaintiffs' reasonable reliance on Meineke's fraudulent concealment of its wrongdoing.

The jury awarded plaintiffs $196,956,596 in compensatory damages, which, over Meineke's objection, was not allocated among the various theories of liability or among defendants. The jury awarded a total of $150 million in punitive damages: $70 million against Meineke; $7 million against New Horizons; $1.8 million against PIC; $70 million against GKN; and $1.2 million total against the three Meineke officers. Required by the district court to make a choice, plaintiffs elected to forgo the punitive award in favor of trebling the compensatory award under the UTPA, see N.C. Gen. Stat. § 75-16. After trebling, the court entered a $590,869,788 judgment for plaintiffs.

9

On March 6, 1997, the district court ruled on two categories of releases signed by some class members: (1) releases executed in connection with the EDP ("EDP releases"), and (2) releases executed in the normal course of business, as when a franchise was terminated or renewed ("non-EDP releases"). The jury had rejected plaintiffs' argument that these releases were procured by fraud, duress, or undue influence on the part of Meineke. Accordingly, the district court held that the EDP releases executed by about half the plaintiff class waived all claims advanced in this lawsuit against the defendants. The court found that non-EDP releases covered only those claims arising before the releases were executed and that non-EDP releases which named Meineke and its "affiliates" released GKN, while releases of Meineke and its "stockholders" did not include GKN.

On May 22, 1997, the trial court disposed of the parties' post-judgment motions. The court calculated the effect of the releases, entering final judgment in plaintiffs' favor for around $390 million (a reduction of approximately 35%). In addition, the court granted plaintiffs' request for a permanent injunction against Meineke's "taking commissions or fees or otherwise deriving any profit from the WAC Fund on account of activities undertaken to purchase and place advertising for those class members who are currently operating Meineke franchises but have not (1) entered Meineke's EDP program, or (2) executed franchise agreements after March 1995." Both parties appeal.[2]

II.

We first consider Meineke's challenge to the ruling that had the largest impact on the conduct of this lawsuit, class certification. As a prerequisite to certifying the class, the district court had to find that the class of "all persons or entities throughout the United States that were Meineke franchisees operating at any time during or after" the creation of New Horizons satisfied the four criteria of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. As the Supreme Court has said, the final three requirements of Rule 23(a) "tend to merge," with commonality

_____

[2] Hereafter, we shall generally refer to defendants collectively as "Meineke," except when necessary to distinguish among GKN and its various subsidiaries.

10

and typicality "serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." General Tel. Co. v. Falcon , 457 U.S. 147, 157 n.13 (1982). The class the district court certified falls well short of the Rule 23(a) threshold in several respects.[3]

A.

The first obstacle to class treatment of this suit is a conflict of interest between different groups of franchisees with respect to the appropriate relief. The Supreme Court and this court have long interpreted the adequate representation requirement of Rule 23(a)(4) to preclude class certification in these circumstances. Amchem Prods., Inc. v. Windsor, 117 S. Ct. 2231, 2250-51 (1997); General Tel. Co. v. EEOC, 446 U.S. 318, 331 (1980); Kidwell v. Transportation Communications Int'l Union, 946 F.2d 283, 305-06 (4th Cir. 1991); Lukenas, 538 F.2d at 596. The Supreme Court "has repeatedly held [that] a class representative must be part of the class and`possess the same interest and suffer the same injury' as the class members." East Texas Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)). The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members. See, e.g., In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785, 796 (3d Cir. 1995). "The problem of actual and potential conflicts is a matter of particular concern in a case such as this one because the [district court certified the class under Federal Rule of Civil Procedure 23(b)]

_____

**3** Meineke also challenges the district court's finding that the class should be certified as a non-opt-out class under Rule 23(b). "It is, however, unimportant to determine whether the action meets the criteria of [section (b)], if . . . plaintiffs' action failed to qualify for class action treatment under . . . section (a) of Rule 23, qualifications which a party must satisfy as a basis for class certification before compliance with section (b) of Rule 23 is considered. . . ." Lukenas v. Bryce's Mountain Resort, Inc., 538 F.2d 594, 596 (4th Cir. 1976).

11

which does not allow class members to opt out of the class action." Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993). But it takes no special scrutiny of the putative class to discern the manifest conflicts of interest within it-- conflicts that the district court simply, and erroneously, ignored.

The class of Meineke franchisees the district court certified can be grouped into three categories: (1) former franchisees; (2) current franchisees who accepted the EDP ("EDP franchisees"); and (3) current franchisees who did not accept the EDP ("non-EDP franchisees"). Broken down this way, it is clear that the remedial"interests of those within the single class are not aligned." Amchem, 117 S. Ct. at 2251. The first group, former franchisees, have an interest only in maximizing any damages Meineke would have to pay. But because of the EDP releases, EDP franchisees are unable to benefit from a damage award. In fact, one group of EDP franchisees sought to intervene below and appear as amici on appeal, claiming that their ongoing business relationship with Meineke and their interests in the long-term financial health of the company were imperiled by plaintiffs' efforts to wring a large damage award out of defendants. These EDP franchisees strenuously urged that, in the interests of both franchisees and franchisor, "the sole and exclusive monetary remedy in this case should be restitution to the WAC account." The interest of former franchisees in damages and of many EDP franchisees in restitution reveals an obvious initial schism within the putative class regarding the appropriate remedy for Meineke's alleged wrongdoing.

Nor were plaintiffs, who are current non-EDP franchisees, able to mediate this conflict. Like former franchisees, non-EDP franchisees do stand to benefit from damages, and it is hard to imagine a larger award than the one at issue here. Nevertheless, in making the class certification decision the district court might reasonably have been concerned that plaintiffs' residual, forward-looking interest, as current franchisees, in Meineke's continued viability would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees. See, e.g., Southern Snack Foods, Inc. v. J & J Snack Foods Corp., 79 F.R.D. 678, 680 (D.N.J. 1978) (citing Aamco Automatic Transmissions, Inc. v. Tayloe, 67 F.R.D. 440 (E.D. Pa. 1975); Thompson v. T.F.I. Cos., Inc., 64 F.R.D. 140 (N.D. Ill. 1974); DiCostanzo v. Hertz Corp., 63 F.R.D. 150 (D. Mass. 1974);

12

Matarazzo v. Friendly Ice Cream Corp., 62 F.R.D. 65 (E.D.N.Y. 1974); Seligson v. Plum Tree, Inc., 61 F.R.D. 343 (E.D. Pa. 1973); Van Allen v. Circle K Corp., 58 F.R.D. 562 (C.D. Cal. 1972); Free World Foreign Cars, Inc. v. Alfa Romeo S.p.A., 55 F.R.D. 26 (S.D.N.Y. 1972)).

That potential conflict of interest apparently did not materialize, but the conflict between plaintiffs and EDP franchisees quite clearly did. Initially, pursuing any litigation at all was in tension with the evident desire of many EDP franchisees to put the advertising dispute with Meineke behind them. The EDP releases did not preclude EDP franchisees from getting the benefit of any advertising funds Meineke restored to the WAC account. Nevertheless, at least three times during the course of this litigation, plaintiffs explicitly disavowed any claim for restitution to or replenishment of the WAC account, focusing instead on a damage award. This election of remedies may have benefitted non-EDP franchisees and former franchisees, but at the expense of the EDP franchisees who made up half of the class. Pursuing a damage remedy that was at best irrelevant and at worst antithetical to the long-term interests of a significant segment of the putative class added insult to the injury of abandoning the only remedy in which that segment (the EDP franchisees) was interested. Plaintiffs' strategy thus illustrates the error of allowing them to sue on behalf of "all" Meineke franchisees.[4]

In a case involving a plaintiff class with a similar conflict in remedial interests, the Seventh Circuit also found that class certification was inappropriate. Gilpin v. American Fed'n of State, Cty., and Mun. Employees AFL-CIO, 875 F.2d 1310 (7th Cir. 1989). In Gilpin nine nonunion employees sued a union to recover fees the union charged nonunion members of a collective bargaining unit. The employees sought to represent approximately 10,000 other nonunion employees,

_____

[4] Because we hold that plaintiffs cannot represent the interests of EDP franchisees, see, e.g., Melong v. Micronesian Claims Comm'n, 643 F.2d 10, 13 (D.C. Cir. 1980) (noting settled law "that proposed class members who have executed releases can not be represented by individuals who have not executed a release"), we do not consider the cross-appeal on the validity of the EDP releases.

13

but the court ruled the case could not proceed as a class action, reasoning that

> [a] potentially serious conflict of interest within the class precluded the named plaintiffs from representing the entire class [of nonunion workers] adequately. Two distinct types of employee will decline to join the union representing their bargaining unit. The first is the employee who is hostile to unions on political or ideological grounds. The second is the employee who is happy to be represented by a union but won't pay any more for that representation than he is forced to. The two types have potentially divergent aims. The first wants to weaken and if possible destroy the union; the second, a free rider, wants merely to shift as much of the cost of representation as possible to other workers, i.e., union members. The "restitution" remedy sought by . . . the nine named plaintiffs, is consistent with -- and only with -- the aims of the first type of employee.

875 F.2d at 1313 (citations omitted). Much the same could be said of the Meineke franchisees lumped together in the class certified below -- three distinct groups "have potentially divergent aims," and the remedy sought by plaintiffs "is consistent with-- and only with -- the aims" of former and like-minded non-EDP franchisees.

The instant class action failed to recover from the error of including the EDPs. The error was not cured by the district court's post-trial order effectuating the releases signed by many class members. Even though this ruling did reduce the damages Meineke owed, it could not repair the harm that was already done to some class members' interests. First, those EDP franchisees who had sought to settle the dispute with Meineke were nevertheless forced into non-opt-out class litigation. And because of plaintiffs' desire for money damages, any interest EDP franchisees had in replenishment of the WAC account was not advanced at trial at all. And, as we have noted, plaintiffs -- ostensibly on behalf of all Meineke franchisees-- repeatedly and explicitly waived any restitutionary claim. If we allowed class certification to stand, thereby binding EDP franchisees to plaintiffs' choice of remedy, the only relief EDP franchisees could pursue would be foreclosed. Second, the post-trial reduction in damages made barely a

14

dent in the big damage award and did not undo the harm to those EDP franchisees who never wanted to be in court. Of course, EDP franchisees have no right to prevent non-released parties from pursuing damages against Meineke, but EDP franchisees do have the right to insist that money damages against Meineke not be pursued in their names.

B.

The pointed "adversity among subgroups" of the class the district court certified, Amchem, 117 S. Ct. at 2251, and the prejudice EDP franchisees suffered as a result, seriously infected the class certification. But the putative class fell short of the commonality and typicality requirements of Rule 23(a)(2) and (3) in other ways. "The typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class." Mace v. Van Ru Credit Corp., 109 F.3d 338, 341 (7th Cir. 1997). Five significant variations in franchisees' "factual and legal arguments" make it clear that this case failed to present common questions of law or fact, see Fed. R. Civ. P. 23(a)(2), and that plaintiffs' claims were anything but typical of the claims of the class, see Fed. R. Civ. P. 23(a)(3).

First, plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts. As the district court itself recognized, Meineke FTAs "may vary from year to year and from franchisee to franchisee." Thus, because Meineke franchisees (and plaintiffs themselves) signed FTAs containing materially different contract language, the actual contractual undertaking of each was subject to several critical variables. Approximately half of the contracts signed by class members suggest Meineke was authorized to use WAC funds for "media costs, commissions and fees, production costs, creative and other costs of . . . advertising." Contracts containing this language are more favorable to Meineke. The reference to "commissions and fees" can be argued to validate the payments from the WAC account, as "commissions" paid to New Horizons and other advertising placement services are what plaintiffs dispute. And the reference to "other costs" can be read as a catch-all category into which the cost of purchasing and placing advertising may well fall.

15

However, about a quarter of the contracts, including some with the provision referenced above, contain language indicating that Meineke should purchase and place advertising "[i]n consideration for the payment of Franchisee's initial license fee" only. This clause makes plaintiffs' case stronger, as it suggests consideration for purchasing and placing advertising must come from some source other than the WAC account. In yet another variation among FTAs, Meineke in some instances waived the license fee that certain versions of the FTA recite as consideration for the promise to purchase and place, raising a wholly distinct set of interpretive issues. Evidently, the breach of contract action that is the cornerstone of plaintiffs' case raises numerous uncommon questions, and the contract claims of plaintiffs are not typical of claims of franchisees who entered into FTAs containing different language.

In a case much like this one, Sprague v. General Motors Corporation, the Sixth Circuit also found that class certification was inappropriate. 133 F.3d 388 (6th Cir.), cert. denied, ___ S. Ct. ___, 1998 WL 174775 (1998). There plaintiffs were former GM employees who had taken advantage of the company's early retirement program. After their retirement, GM reduced the level of benefits to which retirees were entitled, and the retirees sought to bring a class action for breach of contract. As in the instant case, GM had entered into a separate contract with each class member. In these circumstances, the Sixth Circuit found commonality lacking because "[p]roof that GM had contracted to confer vested benefits on one early retiree would not necessarily prove that GM had made such a contract with a different early retiree." Id. at 398. For the same reason, the court also found typicality lacking: "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class. That premise is not valid here." Id. at 399. Nor is it here -- the differences between the FTAs raise the distinct possibility that there was a breach of contract with some class members, but not with other class members. In such a case, the plaintiffs cannot amalgamate multiple contract actions into one.

Second, subjecting plaintiffs' tort and statutory claims to class treatment was likewise problematic. Plaintiffs built their breach of fiduciary duty, fraud, and negligent misrepresentation claims on the shifting evidentiary sands of individualized representations to fran-

16

chisees; these claims have as their starting point what Meineke said to franchisees and how Meineke portrayed its responsibilities vis-a-vis the WAC account. Despite their proffer of standardized documents or other communications disseminated to the entire class to establish these representations, plaintiffs in fact relied heavily on audiotapes of non-standard final review sessions between franchisees and Meineke representatives. In some of these sessions, for example, Meineke's role was portrayed as a mere custodian of WAC funds, in others as a trustee, and in others some combination of both. We are struck by the sheer number of separate statements that were put before the jury to prove a "common" message, and find the Sprague court's rationale for refusing class certification in a similar situation persuasive: "The district court took testimony from more than three hundred class members in an effort to obtain a purportedly representative sample of the representations and communications made by [the defendant]. That it was necessary to do so strongly suggests to us that class-wide relief was improper." 133 F.3d at 399.

The oral nature of the final review sessions makes them a particularly shaky basis for a class claim. Fifth Circuit caselaw even suggests a per se prohibition against class actions based on oral representations. See Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882-83 (5th Cir. 1973). As the Seventh Circuit has indicated, "claims based substantially on oral rather than written communications are inappropriate for treatment as class actions unless the communications are shown to be standardized." Retired Chicago Police, 7 F.3d at 597 n.17. There has been no such showing here. And even to the extent that plaintiffs did introduce UFOCs and other written and standardized communications with franchisees, there is no evidence that all franchisees received, read, and relied on the same literature. If written communications with putative class members "contain material variations, emanate from several sources, or do not actually reach the [putative class members], they are no more valid a basis for a class action than dissimilar oral representations." Simon, 482 F.2d at 882. Thus we conclude as we did in Lukenas that "the rights of these parties, arising as they do out of fraudulent representations which may vary widely between purchasers, are hardly suitable for class treatment." 538 F.2d at 596; accord In re American Medical Sys., Inc., 75 F.3d 1069, 1081 (6th Cir. 1996).

17

Third, the reliance element of plaintiffs' fraud and negligent misrepresentation claims were not readily susceptible to class-wide proof. Under North Carolina law, these claims turn on whether each franchisee reasonably relied on Meineke's representations. See, e.g., Helms v. Holland, 478 S.E.2d 513, 517 (N.C. Ct. App. 1996) ("Justifiable reliance is an essential element of both fraud and negligent misrepresentation."); Carlson v. Branch Banking & Trust Co., 473 S.E.2d 631, 637 (N.C. Ct. App. 1996), rev. denied, 483 S.E.2d 162 (N.C. 1997). North Carolina courts recognize that "[w]hen the circumstances are such that a plaintiff seeking relief from alleged fraud must have known the truth, the doctrine of reasonable reliance will prevent him from recovering for a misrepresentation which, if in point of fact made, did not deceive him." Johnson v. Owens , 140 S.E.2d 311, 314 (N.C. 1965). Specifically, if a plaintiff had an alternative source for the information that is alleged to have been concealed from or misrepresented to him, his ignorance or reliance on any misinformation is not reasonable. E.g., C.F.R. Foods, Inc. v. Randolph Development Co., 421 S.E.2d 386, 389 (N.C. Ct. App. 1992). In this case, proof of reasonable reliance would depend upon a fact-intensive inquiry into what information each franchisee actually had about the operation of the WAC account. Such information might come from conversations with Meineke representatives at final review sessions or on other occasions, conversations with other franchisees, independent analysis of the applicable FTA, audit statements of the WAC account, different editions of the UFOC, and so on.

In Zimmerman v. Bell we affirmed a denial of class certification in the analogous securities fraud context because "[t]o recover in an action for securities fraud, individual class members must demonstrate that the omitted information was not otherwise available to them." 800 F.2d 386, 390 (4th Cir. 1986). There, as here, each class member potentially had access to several alternative sources of the information alleged to have been fraudulently concealed from him. Id. In this circumstance, we reasoned that "[b]ecause the extent of knowledge of the omitted facts or reliance on misrepresented facts will vary from [class member] to [class member], the question of whether the omission was material might require an individual inquiry for each [class member]" that made class treatment impossible. Id. Claims like common law fraud and negligent misrepresentation are no different. In fact, recognizing the inherent individuality of the required analysis,

18

the Fifth Circuit has flatly held that "a fraud class action cannot be certified when individual reliance will be an issue." Castano v. American Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996). And the Sixth Circuit has indicated that claims that "require[ ] proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on those statements to his detriment" are not susceptible to class-wide treatment. Sprague, 133 F.3d at 398. We agree that because reliance "must be applied with factual precision," plaintiffs' fraud and negligent misrepresentation claims do not provide "a suitable basis for class-wide relief." Jensen v. SIPCO, Inc., 38 F.3d 945, 953 (8th Cir. 1994) (discussing analogous estoppel claim).[5]

Fourth, tolling the statute of limitations on each of plaintiffs' claims depends on individualized showings that are non-typical and unique to each franchisee. As we discussed above, the alleged misrepresentations and obfuscations on which plaintiffs base their argument for tolling differed from franchisee to franchisee. The trial court's analysis of equitable tolling should thus have taken the form of individualized inquiry into what each franchisee knew about Meineke's operation of the WAC account and when he knew it. The representations made to each franchisee varied considerably, with some franchisees being informed about New Horizons' role in Yellow Pages advertising and others being given assurances that"we don't make any money on advertising." In Lukenas we recognized that a "considerable difference in right, so far as tolling the statute [of limitations] is concerned," arises when some class members might be able to point to fraudulent misrepresentations while others cannot. 538 F.2d at 597. This "difference in right" precluded class certification there, as it should have here.

Moreover, even assuming that Meineke downplayed or underestimated the amount of payments from the WAC account to New Horizons and other advertising buying agencies, the fact of these payments was unquestionably known by some franchisees from the very beginning. In 1986 Meineke prepared and distributed to fran-

_____

[5] Plaintiffs' reliance on Teague v. Bakker, 35 F.3d 978 (4th Cir. 1994), is misplaced. As the court noted in that case, Teague did not involve a challenge to class certification. Id. at 995 n.24.

19

chisees an audit of the WAC account, which detailed the creation of New Horizons, its role in Yellow Pages advertising, and that "[a]dvertising commissions paid to M&N Advertising and New Horizons Advertising, Inc. during 1986 were based on standard industry practice." This message was repeated in several progressively more detailed annual audits of the WAC account, and several franchisees testified that they in fact reviewed these audits. Whether and when each franchisee received, read, and understood the audit is crucial to whether their contract claim against Meineke is time-barred by North Carolina's three year statute of limitations on contract claims. As the Ninth Circuit has recognized, when the defendant's "affirmative defenses (such as . . . the statute of limitations) may depend on facts peculiar to each plaintiff's case," class certification is erroneous. In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d 847, 853 (9th Cir. 1982).

Finally, each putative class member's claim for lost profits damages was inherently individualized and thus not easily amenable to class treatment. We have previously recognized that the need for individual proof of damages bars class certification in some antitrust cases. See Windham v. American Brands, Inc., 565 F.2d 59, 66 (4th Cir. 1977) (en banc) (describing damages for antitrust violation). In Windham we held proof of damages was "always strictly individualized," and we invalidated "[g]eneralized or class-wide proof of damages" because proof of actual, individual damages was a critical element of a plaintiff's antitrust claim. Id. "The gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury." Id.

This rationale for individualized proof of damages extends beyond the setting of a federal claim in antitrust. Indeed, the

> North Carolina courts have long held that damages for lost profits will not be awarded based upon hypothetical or speculative forecasts of losses. . . . Instead, we have chosen to evaluate the quality of evidence of lost profits on an individual case-by-case basis in light of certain criteria to determine whether damages have been proven with "reasonable certainty."

20

Iron Steamer, Ltd. v. Trinity Restaurant, Inc. , 431 S.E.2d 767, 770 (N.C. Ct. App. 1993) (emphasis added); see also McNamara v. Wilmington Mall Realty Corp., 466 S.E.2d 324, 329-32 (N.C. Ct. App. 1996) (undertaking fact-specific inquiry into lost profits, accounting for numerous variables that affect profits for a single shop), rev. denied, 471 S.E.2d 72, 73 (N.C. 1996).

Plainly plaintiffs' claim for lost profits damages was not a natural candidate for class-wide resolution; the calculation of lost profits is too "dependent upon consideration of the unique circumstances pertinent to each class member." Boley v. Brown , 10 F.3d 218, 223 (4th Cir. 1993). As plaintiffs' expert admitted on cross-examination, the profitability of each Meineke franchise depends on any number of factors, including both tangible factors like market saturation, shop location, and the local economy, and intangibles like the level of service at each shop and the management skills of the franchisee. The district court allowed the jury to calculate lost profits without reference to any of these factors. Moreover, plaintiffs' expert based his lost profits testimony on abstract analysis of "averages": the average effect of ads on sales; an average profit margin based on a sample of franchisees' financial data selected by plaintiffs' counsel to be "appropriately dispersed geographically and appropriately dispersed in terms of the size of the stores"; and an estimate of "on average how many additional cars would have come in per week in the typical Meineke dealer's shop had the additional advertising dollars been spent." The expert admitted that he had "not attempted to calculate the damages that any individual franchisee has suffered in this case," focusing instead on the fictional "typical franchisee operation." Plaintiffs attempted to substitute this "hypothetical or speculative" evidence, divorced from any actual proof of damages, for the proof of individual damages necessary to meet North Carolina's "reasonable certainty" standard of proof for lost profits awards, Iron Steamer, 431 S.E.2d at 770. That this shortcut was necessary in order for this suit to proceed as a class action should have been a caution signal to the district court that class-wide proof of damages was impermissible.

The class the district class certified was thus no more than "a hodgepodge of factually as well as legally different plaintiffs," Georgine v. Amchem Prods, Inc., 83 F.3d 610, 632 (3d Cir. 1996), aff'd, Amchem, supra, that should not have been cobbled together for

21

trial: franchisees' contractual rights and obligations differ; Meineke directed different representations to different franchisees; franchisees relied on these representations in a different manner or to a different degree; each franchisee's entitlement to toll the statute of limitations is fact-dependent; and the profits lost by franchisees also differed according to their individual business circumstances. Plaintiffs do not "advance the same factual and legal arguments" as the class they are supposed to represent. And frankly, in these circumstances, we doubt that any set of claims is common to or typical of this class. Mace, 109 F.3d at 341.

We recognize that a class action may be the most economical and efficient means of litigation in many circumstances, and we do not intend to discourage its use when the claims of named plaintiffs can truly be called representative of class members whose resources would not permit individual lawsuits. To be sure, a"trial court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." American Medical Sys., 75 F.3d at 1079 (citing Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981)). We also do not suggest that the commonality and typicality elements of Rule 23 require that members of the class have identical factual and legal claims in all respects. See Hanlon v. Chrysler Corp., ___ F.3d ___, 1998 WL 296890, at *3 (9th Cir. June 9, 1998); Sprague, 133 F.3d at 399 (typicality satisfied if class claims fairly encompassed by those of named representatives even if not identical). Here it is plain that

> the district court abused its discretion in certifying the class . . . . Some class members may have signed the same form, some may have received the same documents, or some may have attended the same meetings . . ., but taken as a whole the class claims were based on widely divergent facts. Class-wide relief was awarded here without any necessary connection to the merits of each individual claim. Rule 23 does not permit that result.

Sprague, 133 F.3d at 399. The disparate nature of the claims precludes class treatment, and we must reverse the certification ruling of the district court.

22

III.

Often, when a class is decertified, the court evaluates the viability of the named plaintiffs' claims standing alone. See, e.g., Sprague, 133 F.3d at 399 (conducting this analysis). But the setting of this case as a class action so infected the proceedings that we cannot do that here. The practical effect of the district court's certification ruling was felt at every stage of trial.

Specifically, plaintiffs enjoyed the practical advantage of being able to litigate not on behalf of themselves but on behalf of a "perfect plaintiff" pieced together for litigation. Plaintiffs were allowed to draw on the most dramatic alleged misrepresentations made to Meineke franchisees, including those made in final review sessions with absent class members, with no proof that those "misrepresentations" reached them. And plaintiffs were allowed to stitch together the strongest contract case based on language from various FTAs, with no necessary connection to their own contract rights. In fact, plaintiffs' opening argument and their examination of Meineke's General Counsel highlighted the introductory clause to Section 3.1 that appeared in only one quarter of FTAs -- this language was displayed on an illuminated screen next to the jury.

In addition, the class action posture of the case complicated Meineke's efforts to establish the defense of statute of limitations. Normally a claim would have been time-barred if Meineke had shown that the claimant knew about the challenged conduct outside the limitations period. See, e.g., Brooks v. Ervin Constr. Co., 116 S.E.2d 454, 459 (N.C. 1960) ("in an action grounded on fraud, the statute of limitations begins to run from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence"). But in this class action the statutes of limitations did not bar the claims despite evidence that some class members, and even some named plaintiffs, knew about the challenged payments from the WAC account outside the relevant limitations periods.

And Meineke may not have received a fair trial on the breach-of-contract issue because the trial highlighted inappropriate theories of tort and statutory liability, see Section IV, infra. Although it is routine to advance multiple theories of liability in a single suit, see Fed. R.

23

Civ. Pro. 8(e)(2), in this case plaintiffs' non-contract theories of liability may well have impacted the jury's consideration of the contract claims. And because the jury did not apportion its compensatory damage award among theories of liability, calling into question the validity of plaintiffs' recovery on any one theory imperils the entire damage award. Barber v. Whirlpool Corp., 34 F.3d 1268, 1278 (4th Cir. 1994) ("[T]he jury's award of damages cannot stand if either of the two underlying claims is reversed because the general verdict form did not apportion damages between the claims . . . .").

In sum, plaintiffs portrayed the class at trial as a large, unified group that suffered a uniform, collective injury. And Meineke was often forced to defend against a fictional composite without the benefit of deposing or cross-examining the disparate individuals behind the composite creation. Fundamentally, the district court lost sight of the fact that a class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979). It is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members. See 28 U.S.C. § 2072(b) (Federal Rules "shall not abridge, enlarge or modify any substantive right"). Thus courts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be. Because the class action device permitted plaintiffs to strike Meineke with selective allegations, which may or may not have been available to individual named plaintiffs or franchisees, the judgment below cannot stand.

IV.

We respect the fact that class actions may play some role in franchisee-franchisor relations. E.g., Remus v. Amoco Oil Co., 794 F.2d 1238 (7th Cir. 1986) (considering whether change in franchisor's general policies constituted breach of contract with franchisees or violation of state Fair Dealership Law). However, any class that is certified must carefully observe the requirements of Rule 23. While we do

24

not wish to micromanage any retrial, we underscore three errors which must not recur.**6**

A.

The first error involves nothing less than misconceiving the basic character of the lawsuit. The district court ignored North Carolina law limiting the circumstances under which an ordinary contract dispute can be transformed into a tort action. It is true that this suit is one that has aroused strong feelings. Plaintiffs claim they were cheated "every single week for over ten years by their own <u>fiduciary</u>, in connection with the administration of a common advertising trust fund for the benefit of all Meineke dealers." Defendants charge they have been swindled by the legal system itself, in a suit that"represents in micro-cosm much of what has gone awry in the American civil justice sys-tem." Beneath these intense feelings lies a simple fact: the parties differ fundamentally on their rights and obligations under the Fran-chise and Trademark Agreements that govern every aspect of their relationship. Typically thirty-five pages long, the FTAs cover such subjects as confidentiality and Meineke's intellectual property, roy-alty fees and record keeping, training provided by Meineke, standards of operation, transferability of the franchise, and termination. Among the subjects that the agreements address, albeit in different ways and often through different provisions, is that of advertising and how such advertising is to be funded. As we earlier discussed, the topic of advertising is addressed in Sections 3.1 and 7.17 of the FTAs.

At bottom then, this lawsuit centers on a dispute between Meineke and its franchisees over the interpretation of different FTAs and over Meineke's performance under those FTAs. This is a straightforward

_____

**6** We recognize that the parties have raised numerous issues on appeal and cross appeal. However, in view of the fact that we have reversed the judgment in its entirety, we think it unnecessary and in some instances gratuitous to resolve all the many claims of error addressed herein. It should be evident from our discussion of the evidence in this case that, given the multiplicity of contracts and the variations in language among them, it simply is not possible at this point to determine whether or not judgment would be appropriate on certain of these contracts as a matter of law.

contract dispute, yet it somehow managed to become a massive tort action in the end. As one of the named plaintiffs, Kelly Broussard, testified, in the months before this lawsuit was filed, some franchisees were growing increasingly dissatisfied with the cost, amount and quality of Meineke's advertising. Under all versions of the FTA, however, decisions about advertising strategy were within Meineke's sole discretion. So plaintiffs could not address their primary complaint of a poor advertising strategy directly. Instead plaintiffs filed this lawsuit, charging that the FTAs prescribed how Meineke could operate the WAC account and characterizing Meineke's exercise of its discretion not only as tortious conduct, but as conduct that constituted unfair trade practices as well.

The district court erred, however, by allowing plaintiffs to advance tort and UTPA counts paralleling their breach of contract claims. The crux of this matter is and always has been a contract dispute. The defendants believe that Meineke was perfectly entitled under the various FTAs to pay advertising commissions from the WAC account. The plaintiffs say Meineke absolutely was not. Whatever view the parties take of the various FTA provisions at issue did not justify transforming what was essentially a breach of contract action with finite damages into a massive tort suit resulting in a $390 million award. In this, plaintiffs' case is remarkably like Strum v. Exxon Company, where we found a similar "attempt by the plaintiff to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim" to be "inconsistent both with North Carolina law and sound commercial practice." 15 F.3d 327, 329 (4th Cir. 1994).

The list of tort claims brought against the Meineke defendants was extensive: breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, unjust enrichment, negligence, negligent misrepresentation, intentional interference with contractual relations, and unfair trade practices in contravention of the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1. And by any measure, whether in terms of punitive damages for torts or statutory trebling for unfair trade practices, the non-contract component of plaintiffs' recovery made up a significant portion of the nearly $390 million total award.[7] Punitive damages are generally not recoverable for breach of contract, and for good reason. As we explained in Strum:

_____

[7] The jury awarded plaintiffs $150 million in punitive damages on their claims of aiding and abetting breach of fiduciary duty, fraud, intentional

26

The distinction between tort and contract possesses more than mere theoretical significance. Parties contract partly to minimize their future risks. Importing tort law principles of punishment into contract undermines their ability to do so. Punitive damages, because they depend heavily on an individual jury's perception of the degree of fault involved, are necessarily uncertain. Their availability would turn every potential contractual relationship into a riskier proposition.

Id. at 330.

In recognition of the fundamental difference between tort and contract claims, and in order to keep open-ended tort damages from distorting contractual relations, North Carolina has recognized an "independent tort" arising out of breach of contract only in "carefully circumscribed" circumstances. Id. at 330-31 (citing Newton v. Standard Fire Ins. Co., 229 S.E.2d 297, 301 (N.C. 1976)). The district court failed to limit plaintiffs' tort claims to only those claims which are "identifiable" and distinct from the primary breach of contract claim, as North Carolina law requires. See Newton, 229 S.E.2d at 301. For example, plaintiffs' collection of tort claims includes an allegation of fraud and a complaint that Meineke negligently managed the WAC account. But it is plain that "[t]he mere failure to carry out a promise in contract . . . does not support a tort action for fraud." Strum, 15 F.3d at 331 (citing Hoyle v. Bagby , 117 S.E.2d 760, 762 (N.C. 1961); In re Baby Boy Shamp, 347 S.E.2d 848, 853 (N.C. Ct. App. 1986)). Something more is required, and given Meineke's plausible argument for an interpretation of the FTAs that validates its conduct, that something more seems lacking here. In addition, as in Strum, it appears plaintiffs' "claim for gross negligence really arises out of [Meineke's] performance on the contract, not out of the type of distinct circumstances necessary to allege an independent tort." Id. at 332-33.

_____

interference with contractual relations, and willful and wanton negligence. But because the jury also found that Meineke's tortious conduct constituted unfair and deceptive trade practices under the UTPA, plaintiffs chose to substitute the larger figure of treble compensatory damages as the punitive component of their award.

Likewise, the district court should not have allowed the UTPA claim to piggyback on plaintiffs' breach of contract action. It has been said that because "[p]roof of unfair or deceptive trade practices entitles a plaintiff to treble damages," a UTPA count "constitutes a boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina." Allied Distributors, Inc. v. Latrobe Brewing Co., 847 F. Supp. 376, 379 (E.D.N.C. 1993). To correct this tendency, and to keep control of the extraordinary damages authorized by the UTPA, North Carolina courts have repeatedly held that "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UTPA,] N.C.G.S. § 75-1.1." Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992); see also Moseley & Moseley Builders, Inc. v. Landin, Ltd., 389 S.E.2d 576, 580 (N.C. Ct. App. 1990); Coble v. Richardson Corp. of Greensboro , 322 S.E.2d 817, 823-24 (N.C. Ct. App. 1984); Canady v. Crester Mortgage Corp., 109 F.3d 969, 975 (4th Cir. 1997). Even though "[i]n a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted," United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981), North Carolina law requires a showing of "substantial aggravating circumstances" to support a claim under the UTPA. Branch Banking, 418 S.E.2d at 700 (adopting interpretation of UTPA in Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989)). And "the courts have consistently recognized that § 75-1.1 does not cover every dispute between two parties. The courts differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp. 303, 306-07 (M.D.N.C. 1988). Given the contractual center of this dispute, plaintiffs' UTPA claims are out of place.

On remand the observation made by this court in Strum should guide the district court's consideration of plaintiffs' tort claims: "We think it unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." 15 F.3d at 333. If Meineke has failed to fulfill its contractual obligations, the remedy is contract dam-

28

ages, not the blank check afforded to juries when they are authorized to return a punitive award.

B.

The district court erred by allowing plaintiffs to advance their claims for breach of fiduciary duty when there is no indication that North Carolina law would recognize the existence of a fiduciary relationship between franchisee and franchisor. "Rather," in North Carolina "parties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C." Branch Banking, 418 S.E.2d at 699. This general rule has particular applicability here, for the FTAs contain an integration clause, which provides that "[t]his Agreement constitutes and contains the entire agreement and understanding of the parties with respect to the subject matter hereof. There are no representations, undertakings, agreements, terms, or conditions not contained or referred to herein." This clause emphasizes that the nature of the franchise relationship at issue here is to be determined by reference to the written contractual instrument that both parties signed, discouraging the imposition of extra-contractual obligations based upon the welter of conflicting oral statements and representations that plaintiffs introduced at trial.

Moreover, the North Carolina Court of Appeals has also said:

> Our review of reported North Carolina cases has failed to reveal any case where mutually interdependent businesses, situated as the parties were here [in equal bargaining positions and at arms' length], were found to be in a fiduciary relationship with one another. We decline to extend the concept of a fiduciary relation to the facts of this case.

Tin Originals, Inc. v. Colonial Tin Works, Inc. , 391 S.E.2d 831, 833 (N.C. Ct. App. 1990). Tin Originals involved a manufacturer and the company that was the exclusive distributor of the manufacturer's product. The Tin Originals court rejected the argument that the parties' interdependence imparted a fiduciary flavor to their relations. Rather the court emphasized that North Carolina law requires a degree of "superiority and influence" to have developed as a result of

29

this interdependence in order to hold one party to a fiduciary's responsibilities. Id.

Though plaintiffs and some amici would portray franchisees as helpless Davids to the franchisor's Goliath, size, as that story teaches, is not a reliable indicator of strength or influence. Nor is it what North Carolina courts mean by superiority. Only when one party figuratively holds all the cards -- all the financial power or technical information, for example -- have North Carolina courts found that the "special circumstance" of a fiduciary relationship has arisen. E.g., Lazenby v. Godwin, 253 S.E.2d 489 (N.C. Ct. App. 1979). By all lights, Meineke franchisees are independent, sophisticated, if sometimes small, businessmen who dealt with Meineke at arms' length and pursued their own business interests. Tin Originals says that these circumstances do not give rise to a fiduciary relationship.

We have not found, and the parties have not identified, any North Carolina case retreating from Tin Originals. And as a federal court exercising concurrent jurisdiction over this important question of state law we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been willing to go. Our hesitation is strengthened by the refusal of courts in many other jurisdictions to superimpose fiduciary duties on a franchisor-franchisee relationship. See, e.g., Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd., 870 F.2d 273, 280 (7th Cir. 1992) ("parties to a contract are not each other's fiduciaries -- even if the contract is a franchise") (citations omitted); O'Neal v. Burger Chef Sys., Inc., 860 F.2d 1341, 1349 (6th Cir. 1988) ("in general, franchise agreements do not give rise to fiduciary or confidential relationships between the parties. This observation is in accordance with the vast majority of courts which have considered this issue"); Boat & Motor Mart v. Sea Ray Boats, Inc., 825 F.2d 1285, 1292 (9th Cir. 1987) ("The relation between a franchisor and a franchisee is not that of a fiduciary to a beneficiary."); Jack Walters & Sons Corp. v. Morton Bldg., Inc., 737 F.2d 698, 711 (7th Cir. 1984) ("The common law of Wisconsin does not make the franchisor a fiduciary of his franchisees.").**8**

---

**8** We recognize that in exceptional circumstances, when the franchisor really does hold all the cards, a fiduciary duty may exist. See, e.g., Walker v. U-Haul Co., 734 F.2d 1068, 1075 (5th Cir. 1984). This is not, however, the exceptional case.

A fiduciary bears the extraordinary obligation, as the district court explained to the jury, "never [to] place his personal interest over that of the persons for whom he is obliged to act." The near-universal rejection of imposing fiduciary duties in the franchise setting reflects a recognition that these obligations are out of place in a relationship involving two business entities pursuing their own business interests, which of course do not always coincide. Not only is importing fiduciary concepts into the ordinary franchise relationship unworkable, it is unnecessary. At the outset of the franchise relationship, franchisees are protected by federal regulations imposing mandatory disclosure obligations on franchisors. See 16 C.F.R. Part 436. And during the life of the franchise, franchisees are protected by the full panoply of contract remedies for any breach of the franchise agreement. The market imposes a further, overriding restraint on the franchisor. There exists a grapevine among franchisees and franchisors do earn reputations. A franchise system marred by bad franchisor-franchisee relations is unlikely to expand -- or survive.

These points are underscored by the malleable standard the jury used to find a fiduciary duty in this case. The court instructed the jury that such a duty exists "any time one person reposes a special confidence in another" and that the fiduciary relationship "extends to any possible case" in which this special confidence resulted in "domination and influence" on one side of the relationship. This broad basis for imposing fiduciary status leaves open the real possibility of retroactively imposing fiduciary duties on one half of a contractual relationship if the jury accepts the post hoc claims of the other half to have reposed "special confidence" in its contract partner. These claims are all too easy to make at the point of litigation, when the contractual relationship has already broken down and when there is likely to be substantial animosity between contracting parties. And surprising the allegedly "dominant" party with fiduciary responsibilities at this point would strip that party of the benefit of its bargain -- the very contract through which it thought to describe and limit its obligations. Given the elasticity of the standard the district court used, it would be difficult to circumscribe any holding that imported fiduciary concepts into the franchise relationship. Without a clearer signal from the North Carolina courts -- or from the North Carolina legislature -- that they are willing to break with the great majority of other

31

jurisdictions and lower the threshold for imposing fiduciary obliga-
tions, we are unwilling to do so ourselves on their behalf.

C.

Finally, the district court erred by allowing the jury to consider
claims against PIC and GKN.

The court first erred in permitting plaintiffs to pierce the corporate
veil. Disregarding the corporate form to impose vicarious liability on
PIC and GKN was plainly impermissible under North Carolina law.
A corporate parent cannot be held liable for the acts of its subsidiary
unless the corporate structure is a sham and the subsidiary is nothing
but a "mere instrumentality" of the parent. B-W Acceptance Corp. v.
Spencer, 149 S.E.2d 570, 575 (N.C. 1966) (establishing instrumental-
ity rule). In order to find that a subsidiary is a mere instrumentality,
North Carolina requires plaintiffs to show that the parent exercises
"[c]ontrol, not mere majority or complete stock control, but complete
domination, not only of finances, but of policy and business practice
in respect to the transaction attacked so that the corporate entity as to
this transaction had at the time no separate mind, will or existence of
its own." Glenn v. Wagner, 329 S.E.2d 326, 330 (N.C. 1985).

In this case there is no evidence of such "complete domination."
Meineke exhibits none of the characteristics North Carolina courts
have identified as indicative of sham incorporation. Initially, plaintiffs
make no allegation that Meineke is inadequately capitalized. See
Glenn, 329 S.E.2d at 330 (citing Commonwealth Mut. Fire Ins. Co.
v. Edwards, 32 S.E. 404 (N.C. 1899)). In point of fact, as of 1994,
Meineke had total assets of over $14.5 million and net income of over
$10 million. Plaintiffs make much of the fact that Meineke itself is
judgment-proof against the verdict entered below. But this is a func-
tion of the astronomical size of that award rather than of any under-
capitalization. Further, Meineke has observed all corporate
formalities. See id. (citing Hammond v. Williams, 3 S.E.2d 437 (N.C.
1939)). The company holds regular shareholder and board meetings.
It generates its own independently audited financial statements and
keeps its own accounts. It has its own articles of incorporation, by-
laws, minute books, shares, and seal. Moreover, Meineke does not
lack an independent identity. See id. at 331 (citing Waff Bros., Inc. v.

32

Bank of North Carolina, N.A., 221 S.E.2d 273 (N.C. 1976)). Rather Meineke was independently incorporated in 1972, more than ten years before GKN even acquired an indirect ownership interest in it (through PIC) in 1983. And Meineke has retained its independent identity to this day. It is a well-known franchise chain; its connection to GKN is not in the least apparent to its customers. The company has at all times been run by its own officers and employees, who have made significant business decisions for Meineke independently of GKN.

There is no evidence that GKN, located in the United Kingdom, was involved in the day-to-day operations of Meineke, headquartered in North Carolina. GKN did not concern itself with Meineke's FTAs or UFOCs until after this lawsuit was filed. And there is no evidence of GKN's involvement in establishing New Horizons or managing the WAC account. In fact GKN's direct involvement with Meineke has been limited to dealing with occasional special problems that arise. And though GKN does participate on Meineke's Board of Directors, it has never had majority control of Meineke's Board and in fact has a policy of ensuring that it never has majority control of any subsidiary's board. Finally, there is no evidence that GKN's diverse subsidiaries are excessively fragmented into separate corporations. See id. (citing Fountain v. West Lumber Co., 76 S.E. 533 (N.C. 1912)).

We recognize that veil piercing may present a jury question in North Carolina. But the question cannot reach a jury (and, if it has, the jury's verdict cannot stand) without evidence supporting the claim that one corporation is merely an instrumentality of another. Here the evidence suggests an ordinary parent-subsidiary relationship between GKN, PIC, and Meineke. Plaintiffs emphasize that Meineke and GKN share funds; that GKN's "bottom line" ultimately reflects Meineke's profits; and that GKN urged Meineke to enhance profitability and identified New Horizons as a profit center for the company. Far from signaling sham incorporation or complete domination of Meineke by GKN, this evidence supports an entirely benign interpretation. As the owner (through PIC) of all Meineke's stock, GKN has a natural interest in maximizing the return on that investment. Its communications with Meineke and its limited oversight -- as well as the profit motive they reflect -- portray not a sham structure but a legitimate and routine parent-subsidiary relationship.

33

To hold that GKN's involvement justified disregarding the corporate form would place North Carolina well outside the mainstream of corporate law. The United States Supreme Court just recently has had occasion to consider and confirm the "general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." United States v. Bestfoods, 118 S. Ct. 1876, 1884 (1998) (internal quotation marks omitted). Deviating from this rule would destabilize the business and investment climate in North Carolina in disregard of the courts and legislative body of that state. Particularly in view of the participation by the North Carolina Secretary of Commerce as amicus curiae in support of GKN and PIC, we will not chart such a chaotic course.

Plaintiffs advanced several theories of direct liability in an effort to circumnavigate these principles of corporate law, among them aiding and abetting breach of fiduciary duty and intentional interference with contractual relations.

Plaintiffs' claim that PIC and GKN aided and abetted Meineke's breach of fiduciary duty fails for two reasons. First, a cause of action for aiding and abetting breach of fiduciary duty depends on the existence of a fiduciary duty, which, as the preceding section shows, does not exist between Meineke and its franchisees. Even placing aside that basic obstacle to aider and abettor liability in this case, liability is still inappropriate here. Imposing liability for aiding and abetting a breach of fiduciary duty requires a finding that GKN or PIC was "a substantial factor" in Meineke's alleged breach of duty. Blow v. Shaughnessy, 364 S.E.2d 444, 447 (N.C. Ct. App. 1988). But there is no evidence here that GKN or PIC played a role in Meineke's establishment of the WAC account or New Horizons or in Meineke's decisions about how to fund New Horizons and franchise advertising, the very conduct plaintiffs allege breached Meineke's duty. All the evidence shows is that GKN knew a profit center when it saw one and encouraged its subsidiary to expand it. The decisions about creating and funding the account were made by Meineke independently of GKN and PIC, and if these decisions breached a duty, liability for the breach rests solely with Meineke.

34

Plaintiffs' claim that GKN intentionally interfered with contractual relations also should not have been submitted to the jury. The elements of this claim are:

> First, that a valid contract existed between the plaintiff and a third person . . . . Second, that the outsider had knowledge of the plaintiff's contract with the third person. Third, that the outsider intentionally induced the third person not to perform his contract with the plaintiff. Fourth, that in so doing the outsider acted without justification. Fifth, that the outsider's act caused the plaintiff actual damages.

Peoples Security Life Ins. Co. v. Hooks, 367 S.E.2d 647, 649-50 (N.C. 1988) (emphasis omitted) (quoting Childress v. Abeles, 84 S.E.2d 176, 181 (N.C. 1954) (citations omitted)).

We do not think that the fourth element is satisfied here. There is, of course, evidence that GKN and PIC were interested in increasing the profitability of New Horizons: GKN approved bonuses for increasing New Horizons's profitability and PIC considered New Horizons to be a "profit center." The fourth prong, however, requires that the defendant have acted "without justification." "For interference with a contract to be tortious, `plaintiff's evidence must show that the defendant acted without any legal justification for his action . . . .'" Carolina Water Serv., Inc. v. Town of Atlantic Beach, 464 S.E.2d 317, 321 (N.C. Ct. App. 1995) (quoting Varner v. Bryan, 440 S.E.2d 295, 298 (N.C. Ct. App. 1994)).

Under North Carolina law, there was justification here. As the owner through PIC of all Meineke's stock, GKN is protected by a form of qualified privilege for "non-outsiders." See Wilson v. McClenny, 136 S.E.2d 569, 578 (N.C. 1964) ("As stockholders they had a financial interest in the corporation . . . .[B]ecause of their financial interest . . . they had a qualified privilege . . . ."). "In the context of interference with contract by an insider . .. the element that the defendant acted without justification is potentially vitiated by the defendant's corporate position. Officers, directors, shareholders, and other corporate fiduciaries have `a qualified privilege to interfere with contractual relations between the corporation and a third party.'" Embree Constr. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924

35

(N.C. 1992) (quoting Wilson, 136 S.E.2d at 578); see also Smith v. Ford Motor Co., 221 S.E.2d 282, 292-93 (N.C. 1976). Indeed, the North Carolina Supreme Court has emphasized that such parties having "`an interest in the activities of a corporation or the duty to advise or direct such activities should be immune from liability for inducing the corporation to breach its contract, assuming their actions are in pursuit of such interests or duties. Public policy demands that so long as these parties act in good faith and for the best interests of their corporation, they should not be deterred by the danger of personal liability.'" Wilson, 136 S.E.2d at 578 (quoting Alfred Avins, Liability for Inducing a Corporation to Breach Its Contract, 43 Cornell L.Q. 55, 65 (1957)).

Here, we believe for several reasons that the privilege should obtain. GKN and PIC, as parents and shareholders in Meineke, took an interest in Meineke's bottom line and implored Meineke to increase its profitability by pursuing an advertising strategy which it was at least arguably entitled to pursue under the contract. Although we cannot and do not decide whether Meineke's various contractual contentions will ultimately prevail on remand, see supra note 6, we do think it incorrect to hold GKN and PIC liable on a tortious interference theory when the contract language itself admits of respectable arguments from both sides in this case as to whether Meineke's conduct comported with the FTA conditions. Such good-faith actions taken by shareholders -- urging the corporation to maximize profits -- are privileged under North Carolina law and cannot form the basis of a tortious interference claim.

Any apparent tension between North Carolina's recognition of a qualified privilege and its reluctance to pierce the corporate veil is easily resolved. Shareholders who take an active interest in the affairs of the corporation are "non-outsiders" and thus protected from tortious interference claims by the qualified privilege. And if those shareholders do not completely dominate the affairs of the corporation, the corporate veil will not be pierced and they will be shielded from vicarious liability. Setting up such a safe harbor preserves the advantages of limited liability while encouraging shareholders to actively monitor corporate affairs.

It is true that the qualified privilege may be waived and liability may be imposed where an insider's "acts involve individual and sepa-

36

rate torts . . . or where his acts are performed in his own interest and adverse to that of his firm." Wilson, 136 S.E.2d at 578 (internal quotation marks omitted). Yet there can be no contention that individual self-dealing, as opposed to corporate well-being, was at issue in these decisions. Assiduous parental attention, extended in good faith, to the profitability of a subsidiary is not tortious misconduct. To make it such would be to repeal the qualified privilege conferred by North Carolina law. Again, the basic action here is one for breach of contract, and GKN and PIC were not parties to any contract with the plaintiffs. Thus, despite plaintiffs' theories of veil-piercing and parental tort liability, there is no basis under North Carolina law for liability on GKN or PIC. As a result, we instruct the district court that GKN and PIC must be dismissed from the action on remand.

V.

We do not dismiss the action against Meineke, however. The plaintiffs in this lawsuit may have some legitimate grievance with Meineke's conduct. They retain a variety of contract remedies for any breach that may have occurred. Those remedies include, where appropriate, restitution to the WAC account and consequential contract damages in the form of franchisees' lost profits. See generally John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14-5, at 595-96, § 15-4, at 651-53 (3d ed. 1987). And it is not inconceivable that a class action might be used in a carefully controlled manner to achieve the economies and efficiencies for which that device was intended. But in various ways this lawsuit managed to wander way beyond its legitimate origins, and at the end it spun completely out of control, with a diffuse class and proliferating theories of liability. In fact, this lawsuit came close to visiting corporate ruin on Meineke over what is a vigorous but straightforward contract dispute, totally losing sight of the basic principle that in size and in nature a legal remedy must bear some degree of proportion to the extent of the legal wrong actually committed. If we permitted this judgment to stand, commercial disputes and contract law would be transformed -- a string of tort claims advanced in a sprawling class action would put many companies -- and their corporate parents-- out of business.

We do respect the important role of juries in striking the balance between injury and recompense. Nevertheless, like the class action

37

device, the jury's function must be exercised under the guidance and within the framework of basic principles of law. Without respect for law neither the class action device nor the jury system can serve the important functions for which they were intended. Because the most primary principles of procedure and the most settled precepts of commercial law were not observed here, the judgment of the district court is reversed in its entirety, and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED