UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROGER EDMONDSON,

*Plaintiff-Appellee,*

v.

AMERICAN MOTORCYCLE ASSOCIATION, INCORPORATED, a/k/a American Motorcyclist Association, an Ohio not for profit Corporation; PARADAMA PRODUCTIONS, INCORPORATED, d/b/a AMA Pro Racing, an Ohio Corporation,

*Defendants-Appellants.*

No. 99-1299

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-96-235-1)

Argued: December 5, 2000

Decided: February 2, 2001

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Edward Anthony Matto, BRICKER & ECKLER, L.L.P., Columbus, Ohio, for Appellants. Martin Karl Reidinger, George

Ward Hendon, ADAMS, HENDON, CARSON, CROW & SAENGER, P.A., Asheville, North Carolina, for Appellee. **ON BRIEF:** Elizabeth H. Watts, Diane Richards Brey, BRICKER & ECKLER, L.L.P., Columbus, Ohio; John H. Hasty, WAGGONER, HAMRICK, HASTY, MONTEITH & KRATT, P.L.L.C., Charlotte, North Carolina, for Appellants.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

In this business tort case, motorcycle road racing promoter and operator Roger Edmondson (Edmondson) sued his competitor and former joint venturer, the American Motorcycle Association (the AMA), and a closely-related entity, Paradama Productions, Inc. (Paradama), (collectively the Defendants). Of relevance to the issues on appeal, Edmondson's suit alleged claims of conversion, constructive fraud, and intentional interference with contracts under North Carolina common law and a claim of unfair and/or deceptive practices in or affecting commerce under North Carolina General Statutes § 75-1.1, N.C. Gen. Stat. § 75-1.1.

The jury found the Defendants liable with respect to each of these claims. With respect to the common law claims, the jury awarded Edmondson a total of $930,000 in actual damages and $1,000,000 in punitive damages ($750,000 against the AMA and $250,000 against Paradama). Pursuant to § 75-16, Edmondson elected to treble the amount of actual damages the district court presumed the jury awarded with respect to his § 75-1.1 claim, $930,000, in lieu of receiving the combined amount of actual and punitive damages awarded by the jury on his common law claims.

The Defendants made timely post-trial motions for judgment as a matter of law or, in the alternative, for a new trial with respect to each

claim upon which Edmondson prevailed. The district court denied those motions and entered judgment in favor of Edmondson for $2,790,000 ($930,000 X 3). The district court also awarded Edmondson, over the Defendants' objection, $390,965 in attorneys' fees and $40,707.81 for disbursements pursuant to § 75-16.1

The Defendants now appeal the district court's denial of their post-trial motions and the statutory attorneys' fees/disbursements award. For the reasons that follow, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

The backdrop for this case is the competitive business of promoting and operating professional motorcycle road racing on paved oval tracks. For a professional road racing series to be financially successful, it needs various classes of races, riders to compete in each of the classes, factory teams, sponsors of the events for particular races or particular contingencies (such as the winning rider riding on the sponsor's tires), and a track conducive to professional road racing with facilities for fans. Classes of races are typically defined by the type of motorcycles run in the race.

Until 1995, the AMA ran professional motorcycle races of various types, including road racing. The AMA is an Ohio not-for-profit corporation with its principal place of business in Westerville, Ohio. Since 1995, Paradama, a for-profit subsidiary of the AMA, has run the professional motorcycle road races instead of the AMA. Paradama generally does business as "AMA Pro Racing," and maintains its principal place of business in conjunction with and in the same location as the AMA.

In 1984, Edmondson founded Championship Cup Series, Inc. (CCS) in Skyland, North Carolina. From 1984 through 1989, Edmondson, through CCS, successfully ran amateur and minor league professional motorcycle road races on tracks throughout the nation. During this period, Edmondson paid the AMA a sanctioning fee with respect to his races in order to advertise that his races were sanctioned by the AMA. For the years 1984 through 1989, CCS did not share any profits with the AMA, nor was it required to do so for any reason.

On February 6, 1990, CCS and the AMA executed a joint venture agreement (the 1990 JVA) to jointly administer minor and major league professional motorcycle road races. Under the 1990 JVA, all races or meets were to be designated as "AMA National Racing." The 1990 JVA provided for the administration of the various classes of races, identified which party would administer which races, and provided for the method of payment for the various administrative functions. For example, the 1990 JVA provided that the AMA would administer the Superbike, Pro Twins, and 250 GP racing classes, while CCS would administer the Supersport, Endurance, and U.S. Twinsports racing classes. The 1990 JVA also included a non-compete provision prohibiting CCS from competing in professional motorcycle road racing for two years after termination of the 1990 JVA. With respect to revenue, the 1990 JVA provided that CCS should receive all participant fees connected with riders competing in CCS administered classes and all sponsorship fees generated from CCS administered classes. The 1990 JVA contained a parallel revenue provision with respect to the AMA, with any remaining net profit to be divided equally.

On July 24, 1990, the AMA and Edmondson, on behalf of CCS, executed an agreement providing that, for a fee, the AMA would grant sanctions for all racing events conducted by Edmondson and allow Edmondson to use the AMA logo (the Sanction Agreement) in connection with such events. The Sanction Agreement also provided that "Edmondson agrees to submit to the AMA on a timely basis a list of the entrants at national championship events, including their competition classes, home addresses and AMA numbers." (J.A. 2028). The Sanction Agreement had an automatic renewal provision for one-year terms beginning each January 1, unless either party gave notice no later than September 30 of the preceding year that it did not intend to renew.

CCS and the AMA renewed their joint venture relationship under the same terms as the 1990 JVA for the years 1991, 1992, and 1993.[1]

---

[1]In 1992, Edmondson sold the amateur part of his business to his daughter. This part of his business is not at issue on appeal.

On a different note, after the 1992 joint venture agreement was signed, the parties agreed for the joint venture to pay $10,000 per race weekend

Toward the end of the 1993 racing season, the AMA offered to buy Edmondson's share of the joint venture upon mutually agreeable terms and bring all of the racing products in-house. In conjunction with this offer, the AMA offered to hire Edmondson as a salaried employee to "run the program." (J.A. 1173). The AMA then retained the accounting firm of Ernst & Young to provide it with a value of Edmondson's interest in the joint venture. Ernst & Young valued Edmondson's interest in the joint venture at between $720,000 and $1,000,000 based on cash flow projections.[2]

Although negotiations between the AMA and Edmondson continued for some time, the parties came to dispute whether Edmondson owned certain classes of races.[3] In August 1993, while negotiations continued, Edmondson orally notified the AMA that he desired to terminate immediately the various agreements between himself or CCS and the AMA. Edmondson followed up with written notice to this effect in October 1993. During the negotiations, Edmondson, on behalf of CCS, and the AMA executed a final joint venture agreement

---

to have the races broadcast by television, with the joint venture receiving any revenue generated by the broadcasts. The AMA ultimately acknowledged in 1994 that $35,000 in net television revenue was generated during the 1992 season with no portion ever being paid to Edmondson. In addition to those funds, the AMA failed to account to Edmondson for the sale of the rights to broadcast the races in Japan, which sold for $75,000 in 1992. Finally, the AMA cost the joint venture $100,000 in profits by unilaterally forfeiting an opportunity to sell the rights "to produce the shows, to produce the Road Racing television," to a television cable company in Denver named Prime Network. (J.A. 1321). The $35,000, $75,000 and the $100,000 in television revenue lost or not reported to Edmondson totaled $210,000.

[2]Over the years of the joint venture relationship, Edmondson's interest in the joint venture generated for him between $794,000 and $1,100,000 per year. At trial, Edmondson presented expert testimony valuing his interest in the joint venture relationship as of September 18, 1994 at $1,114,450. The expert based his valuation entirely upon cash flow projections and did not give a separate valuation of the tangible assets such as computers and racing equipment that Edmondson brought to the joint venture.

[3]At trial, Edmondson testified that he was not claiming that the AMA could not run the 600 or 750 Supersport class without his permission.

(the 1994 JVA) to allow time for the negotiations to continue and to allow the professional racing series the parties had operated under the consecutive joint venture agreements to continue. The provisions of the 1994 JVA were identical to those of the previous years, except that the 1994 JVA did not contain a non-compete provision. Also, the 1994 JVA provided that it would automatically terminate after one year unless terminated earlier by either party with thirty days notice.

Somewhere along the way, the AMA decided it wanted to assume control of Edmondson's interest in the 1994 joint venture without compensating him. Thus, the negotiations between Edmondson and the AMA never reached the point of a signed agreement. In late 1993, Tom Mueller, a vice president of the AMA, directed Roy Janson, the then head of the AMA's racing department, to prepare a memorandum regarding how the AMA could effect a secret takeover of Edmondson's interest in the 1994 joint venture. Janson had completed and submitted the requested memorandum by the end of December 1993. In early April 1994, the AMA implemented the secret takeover plan outlined in Janson's memorandum with a few revisions.

As part of that plan, the AMA notified Edmondson on April 16, 1994 that it was exercising its right to terminate the 1994 JVA. However, the AMA, through one of its board of directors, still led Edmondson to believe that it intended to strike a deal with him to purchase his interest in the joint venture. Meanwhile, the AMA sought surreptitiously to download from Edmondson's race computer the software necessary for registering entrants.

On April 22, 1994, Edmondson met with the AMA's Board of Directors. Edmondson describes what took place at this meeting as follows:

> It was presented to me that the [AMA] wanted to pursue this, bringing this to a close and that all of these negotiations back and forth with the price had not been working and so they wanted [to] approach it a different way; and that was [to] use some sort of a formula which would insure my continued cooperation in the success of my business they bought from me, except they didn't want to talk about buying a business. It was kind of a win-win thing. We are going

to have to call a horse a cow here. We will talk about money
or ways to pay you, but we are not going to talk about buy-
ing the business.

* * *

They agreed to pay me a figure that I don't recall at the
moment for each entry in any of the future [AMA] national
championship events for the next five years. . . . [W]e ended
up with a compromise program which was going to pay me
$10,000 per race for the next five years, plus $45 for every
entrant in those races.

(J.A. 1209-10).

In reliance upon the AMA's assurances that he had struck a deal,
Edmondson and his staff "immediately began the process of transfer-
ring control of the operation to the AMA." (J.A. 1214). Edmondson
testified that

[o]ver the next 60 days we had three race events and a lot
of work to do to make sure those events took place. But it
gave us an opportunity to do in a fairly short amount of time
a lot of training and a lot of transfer.

We began the process by dealing with the pre-entry mail-
ers for the upcoming events. There was a desire stated to me
to make sure the mailers that came from the AMA looked
like the ones I had been doing, so I worked with them in the
choice of software, type faces. And after they sent me sev-
eral drafts, approved the pre-entry mailers and from that
point on they handled the production of pre-entry mailers.

(J.A. 1214). In response to the question at trial as to "what categories
of the control of [his] business that [he] turned over to the AMA in
this 60 day period," (J.A. 1214), Edmondson testified as follows:

Well, the first one was, of course, again the production of
pre-entry mailers. And then subsequently the entries, instead

of coming to my office started going to the AMA's office. There were issues involving the Paddock Club, which was a hospitality program we had for corporate members and guests of team members. I made sure at each event to introduce [AMA Vice President] Tom Meuller, if he was there, and Ron Barrick to the track owners and their staff members with the understanding that they would be taking over the program the following season.

In particular, at Laguna Seca [Racetrack] out in California had [sic] the opportunity to introduce them to the principles [sic] of two of my major sponsors . . . and made it clear to those sponsors that this transfer was taking place and that next year instead of doing business with me, they would be expecting contract proposals from the AMA.

(J.A. 1215).

Edmondson testified that he physically showed employees of the AMA how to use the computer program he had developed to conduct the preregistration process. On July 17, 1994, AMA Board of Directors member Carl Reynolds verbally assured Edmondson that "we have a deal" and that all that has been taking place for the last sixty to seventy-five days has just been the activities of the lawyers. (J.A. 1218-19). Shortly thereafter, the AMA's administrative director of operations for its professional racing department, Dee White, requested by telephone that Edmondson send the AMA a copy of his mailing list (the Mailing List) and a set of pre-addressed mailing labels. Edmondson agreed to send her the pre-addressed mailing labels containing the addresses of the participants that he had cultivated as customers on the condition that the AMA would not make a record of the addresses. Dee White agreed, and thus, Edmondson sent the pre-addressed mailing labels to the AMA on July 20, 1994.

After the AMA received the mailing labels, it refused to consummate any deal with Edmondson. At trial, Edmondson testified that once he realized that the AMA refused to consummate the deal he

recognized that my business that I had spent eleven years with my family developing was gone and to recognize that

> I had participated in my own demise, so to speak. I had will-
> ingly turned over the control of this business to my custom-
> ers, promoters, the sponsors, and I had done so in reliance
> on this deal. I had to recognize the fact that I no longer after
> the final event, had an income, nor a business.

(J.A. 1222). During the 1995 racing season, the AMA, through Para-
dama and without the involvement of Edmondson or CCS, "went out
and held themselves out as continuing the identical series that was in
1994 and '93 and '92 under the Joint Venture Agreement." (J.A.
1679).

Beginning in early 1995, Edmondson started from scratch with a
new racing enterprise named "North American Sports Bike" (NASB)
and attempted to sell it to track owners and attract participant riders.
In evaluating Edmondson's new product, track owners looked to three
acknowledged leaders in the business as to how they would respond.[4]
The three acknowledged leaders are the Mid-Ohio Race Track, the
Road America Race Track and the Brainerd Race Track. Among
these, the Mid-Ohio Race Track was the clear leader. After Edmond-
son had secured commitments from these three track owners and sev-
eral lesser tracks to run his new series, Paradama's Chairman of the
Board, Cary Agajanian, directly contacted the marketing manager for
the Mid-Ohio Race Track, John Szymanski, and threatened to cancel
other important contracts between the Defendants and the track if the
track honored its commitment to Edmondson. The Mid-Ohio Track
canceled its contract with Edmondson in response to the threat. The
Mid-Ohio Track's cancellation in turn caused cancellations by the
Road America Race Track and Brainerd Race Track. As a result of
these events, Edmondson's new business never got off the ground. He
subsequently took a salaried position with the amateur racing com-
pany he had sold to his daughter, but ultimately had to file a petition
for bankruptcy protection under Chapter 11 of the United States
Bankruptcy Code.

On September 17, 1996, Edmondson filed a complaint against the
Defendants in the United States District Court for the Western District

---

[4]Only about sixteen tracks in the country are capable of handling this
type of motorcycle road race.

of North Carolina based upon federal question jurisdiction. *See* 28 U.S.C. § 1331. Edmondson's complaint asserted the following causes of action: (1) common law conversion of the Mailing List; (2) common law interference with contract and business relations; (3) common law conversion of Edmondson's business interests and assets that he brought to the 1994 joint venture; (4) violation of the Sherman Act, 15 U.S.C. §§ 1-2, by "tying"; (5) violation of the Sherman Act by "refusing to deal"; (6) violation of the Sherman Act by predatory practices; (7) constructive fraud involving the television revenue; (8) an accounting of joint venture income and expenses; (9) common law unfair competition; and (10) unfair and deceptive practices in or affecting commerce in violation of North Carolina General Statutes § 75-1.1 (§ 75-1.1).[5]

The Defendants successfully obtained summary judgment in their favor with respect to Edmondson's three claims under the Sherman Act. The district court retained jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367. Except for Edmondson's request for an accounting of joint venture assets and his common law unfair competition claim, Edmondson presented his remaining claims to a jury in December 1998.[6]

The jury gave its verdict in the form of answers to special interrogatories. The jury first found that Edmondson owned the Mailing List; the Defendants wrongfully converted the Mailing List; and such conversion caused Edmondson $50,000 in damages. Second, the jury found that the Defendants had wrongly interfered with Edmondson's respective 1995 contracts with the Mid-Ohio Race Track, the Brai-

---

[5]The Defendants filed various counterclaims that are not at issue in this appeal. We, therefore, mention them no further.

[6]The Defendants conceded in their trial brief that North Carolina law applied to every cause of action except for statutory unfair competition. Also during the charging conference, the Defendants agreed that the essential elements of each cause of action, except the claim for statutory unfair competition, were identical under Ohio and North Carolina law. On appeal, the Defendants make some attempt to assert that Ohio law applies to Edmondson's common law claims, but in light of the Defendants' concessions below in this regard, the Defendants have waived that argument.

nerd Race Track and the Road America Race Track. The jury awarded Edmondson $10,000 with respect to each of these three contracts for a total of $30,000. Third, the jury found the Defendants had wrongfully converted business interests and assets brought by Edmondson to the 1994 joint venture. The jury awarded Edmondson $750,000 in damages for the Defendants' actions in this regard. Fourth, the jury found the AMA had a fiduciary duty to Edmondson from 1990 through 1994; the AMA breached such duty; the AMA did not act openly, fairly, and honestly with Edmondson; and as a result of the AMA's actions in this regard, Edmondson was entitled to $100,000 in damages.

Fifth, the jury found in favor of Edmondson with respect to his claim alleging the Defendants violated § 75-1.1. In this regard, the jury specifically found that the Defendants had asserted control over Edmondson's interest in the 1994 joint venture and/or excluded him from the business; the Defendants misrepresented to Edmondson their intention to purchase his interest in the joint venture; the Defendants failed to disclose to Edmondson the terms and/or nature of television coverage contracts for motorcycle races produced by the joint venture; the Defendants marketed and promoted professional motorcycle races in 1995 and/or thereafter as if those races were the same product which had been produced by the joint venture; the Defendants marketed and promoted professional motorcycle races in 1995 and/or thereafter as if those races were a continuation of the series operated by the joint venture prior to 1995; and the defendants interfered with actual and prospective contractual rights of Edmondson when he was attempting to carry on his new motorcycle racing business. The jury found all of this conduct affected commerce and proximately caused Edmondson injury in the amounts stated. Finally, the jury awarded Edmondson $750,000 in punitive damages against the AMA and $250,000 in punitive damages against Paradama. In sum, Edmondson prevailed on five claims: common law conversion of the Mailing List, intentional interference with contracts, common law conversion of his interests and assets that he brought to the 1994 joint venture, constructive fraud, and statutory unfair and/or deceptive practices in or affecting commerce.

On December 30, 1998, the district court entered judgment in favor of Edmondson for $2,790,000. This figure represents a statutory tre-

bling of the $930,000 the district court presumed the jury awarded Edmondson in actual damages with respect to his § 75-1.1 claim. Edmondson elected to recover this amount in lieu of receiving the total amount of actual and punitive damages awarded by the jury on his common law claims. *See* N.C. Gen. Stat. § 75-16. The district court awarded Edmondson $390,965 in attorneys' fees and $40,707.81 for disbursements based upon its findings that the Defendants willfully engaged in several unfair and deceptive practices in or affecting commerce and made an unwarranted refusal to fully resolve the matters constituting the bases of Edmondson's § 75-1.1 claim. *See* N.C. Gen. Stat. § 75-16.1. The Defendants unsuccessfully opposed the attorneys' fees/disbursements award as unwarranted by the evidence and on the ground that it was excessive.

On January 11, 1999, the Defendants filed a post-trial motion for judgment as a matter of law with respect to all claims or in the alternative for a new trial with respect to all claims. The district court denied the motion on February 10, 1999.

This timely appeal followed. On appeal, the Defendants challenge the district court's refusal to grant their post-trial motions for judgment as a matter of law or, in the alternative, for a new trial. Additionally, the Defendants challenge the district court's award for attorneys' fees and for disbursements under § 75-16.1.

II.

Under Federal Rule of Civil Procedure 50, "a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097, 2109 (2000) (quoting Federal Rule of Civil Procedure 50(a)). In considering a motion for judgment as a matter of law, the district court should review "all of the evidence in the record." *Id.* at 2110. "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.*

> Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the mov-

ing party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the non-movant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses."

*Id.* (quoting 9A Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2529, p. 299 (2d ed. 1995)). We review *de novo* a district court's decision to grant or deny a motion for judgment as a matter of law. *See In re Wildewood Litigation*, 52 F.3d 499, 502 (4th Cir. 1995).

In contrast, we review a district court's decision to deny a motion for a new trial made pursuant to Federal Rule of Civil Procedure 59 for abuse of discretion. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). Under Rule 59, a new trial should be granted only if "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 100 (4th Cir. 1991) (internal citation and quotation marks omitted).

## III.

The Defendants first contend the district court erred by denying their motion for judgment as a matter of law or, in the alternative, for a new trial with respect to Edmondson's claim for conversion of the Mailing List. In North Carolina, conversion is generally defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Peed v. Burleson's, Inc.*, 94 S.E.2d 351, 353 (N.C. 1956) (internal quotation marks omitted). According to the Defendants, Edmondson's claim for conversion of the Mailing List is nothing more than a contract dispute. Therefore, the Defendants argue, under our decision in *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), Edmondson's claim for conversion of the Mailing List cannot stand.

*Broussard* stands for the proposition, among others not relevant here, that a party is not liable under North Carolina common law the-

ories of tort or under § 75-1.1 if the dispute at issue is an ordinary contract dispute. *See id.* at 345. For example, a dispute over the interpretation of the terms of a contract cannot be transformed into a tort action. *See id.*

The Defendants argue that *Broussard* comes into play here because Edmondson's claim for conversion of the Mailing List rests upon an interpretation of the following provision of the Sanction Agreement: "Edmondson agrees to submit to the AMA on a timely basis a list of the entrants at national championship events, including their competition classes, home addresses and AMA numbers." (J.A. 2028). We disagree that Edmondson's claim for conversion of the Mailing List rests upon an interpretation of this quoted provision of the Sanction Agreement. As stated previously, the Sanction Agreement, first executed in July 1990 for a term ending December 31, 1990, contained an automatic one-year renewal provision for the next calendar year unless either party gave notice of an intent to terminate the agreement no later than September 30. The record plainly reflects that Edmondson notified the AMA in August 1993 that he intended to cancel all current written agreements with the AMA and that the automatic renewals would not take place. Thus, if the Sanction Agreement was still in force in August 1993, it did not automatically renew on January 1, 1994. Therefore, when Edmondson gave the AMA the Mailing List in the form of pre-addressed mailing labels in July 1994, the Sanction Agreement had not been in force for seven months.

Because Edmondson was under no contractual obligation to give the AMA the Mailing List in July 1994, his conversion claim cannot be fairly characterized as a contract dispute. Thus, Edmondson's conversion claim regarding the Mailing List does not suffer from a *Broussard*-type problem. To the extent the Defendants argued to the jury that they already possessed the complete contents of the Mailing List prior to July 1994 on account of Edmondson's previous obligation to provide it under the Sanction Agreement, our conclusion is not affected. The jury obviously heard all of the evidence pertaining to whether the AMA already possessed the contents of the Mailing List. The jury was certainly entitled to infer that the AMA did not already possess the contents of the list from the fact that the AMA's Director of Operations requested the list from Edmondson in July 1994.

In sum, we affirm the district court's judgment in favor of Edmondson on his claim for conversion of the Mailing List.

### IV.

The Defendants next contend the district court erred by denying their motion for judgment as a matter of law or, in the alternative, for a new trial with respect to Edmondson's claim for conversion of the tangible and intangible assets that he contributed to the 1994 joint venture. According to Edmondson, this claim pertained to the Defendants' actions in converting tangible assets "like computer hardware and software for entries and scoring, safety equipment, a dynamometer, air fences, brake markers, radios, flags, awnings, tables and chairs, and food preparation equipment for the Paddock Club," and intangible assets such as the good will of his corporation and certain racing classes that he had cultivated over the years. (Edmondson's Brief at 44).

The Defendants make two arguments in support of their challenge to this claim. First, they argue that Edmondson's second conversion claim is grounded upon the 1994 JVA, and thus our decision in *Broussard*, discussed *supra*, bars the claim. Second, the Defendants contend the record lacks any evidence that they converted any property belonging to Edmondson that may be the proper subject of a conversion claim. We address each of these arguments in turn.

The record shows that Edmondson's claim for conversion of the tangible and intangible assets that he contributed to the 1994 joint venture is not grounded upon the 1994 JVA. First, the claim does not rest upon an interpretation of any of the joint venture agreements. Second, the claim focuses upon actions by the Defendants occurring after April 16, 1994, the date the AMA notified Edmondson that it was exercising its right to terminate the 1994 JVA. The claim's reference to the 1994 JVA is merely descriptive of the property Edmondson alleged the Defendants wrongly converted after the parties no longer had a joint venture relationship. Because the claim is not grounded upon any contractual agreement between the parties, a *Broussard* problem does not exist.

The Defendants' second argument raises the question of what type of property may be the proper subject of a claim for conversion under

North Carolina's common law. Here, the district court charged the jury that under North Carolina law: "Conversion is the unauthorized exercise of a right of ownership over personal property belonging to another and/or the unauthorized exclusion of an owner from exercising his rights of ownership over his own personal property." (J.A. 1701). The district court did not give an instruction excluding intangible assets such as business expectancies or good will from the term "personal property."

At trial, the Defendants objected to the district court's refusal to instruct the jury that Edmondson's conversion claim regarding the assets he contributed to the 1994 joint venture must be limited to "capital assets that the Plaintiff might identify." (J.A. 1024). A capital asset is a "long-term asset used in the operation of a business or used to produce goods or services, such as equipment, land, or an industrial plant." *Black's Law Dictionary* 113 (7th ed. 1999). The definition of the term capital asset naturally excludes intangible assets such as business expectancies and good will. *See id.* (defining the term "intangible asset as [a]n asset that is not a physical object, such as a patent, a trademark, or goodwill").

The Defendants are correct that intangible business assets such as business expectancies and good will may not be the proper subject of a claim for conversion under North Carolina's common law. *See Norman v. Nash Johnson & Sons' Farms, Inc.*, 537 S.E.2d 248, 264 (N.C. Ct. App. 2000) (holding that a claim for conversion under North Carolina common law does not apply to "*intangible interests such as business opportunities and expectancy interests*"); *see also* W. Page Keeton *et al.*, *Prosser and Keeton on Torts*, § 15 at 91-92 (5th ed. 1984) (recognizing traditional common law rule that a business' good will is not the proper subject of a conversion claim). Thus, the Defendants were correct to object to the district court's instruction regarding the claim of conversion that allowed the jury to find the Defendants liable for conversion of intangible assets in the nature of business expectancies and good will. Indeed, the jury's $750,000 award with respect to this claim leads us inescapably to believe that it did so. First, the jury heard no evidence regarding the value of any tangible assets that Edmondson used in his business such as flags, computers, or radios. Second, the jury heard evidence that Ernst and Young valued Edmondson's business at between $720,000 to

$1,000,000 *based on cash flow*. Indeed, Edmondson's expert witness valued Edmondson's business by using cash flow projections. The fact that cash flow projections are quintessentially business expectancies underscores the problem with the conversion claim at issue. Finally, the record contains no other evidence regarding the value of the assets of Edmondson's business.

In sum, we hold the judgment in favor of Edmondson with respect to his claim alleging conversion of his tangible and intangible business assets is materially infirm for the reasons just discussed. Accordingly, we vacate the district court's judgment with respect to that claim and remand with instructions that the district court conduct a new trial on the claim with jury instructions that make clear that intangible business assets in the nature of business expectancies and good will are not the proper subjects of a conversion claim under North Carolina law.

## V.

Next, the Defendants challenge the district court's refusal to grant them judgment as a matter of law or, in the alternative, for a new trial with respect to Edmondson's claim for tortious interference with contracts.

The elements of this claim are:

> First, that a valid contract existed between the plaintiff and a third person . . . . Second, that the outsider had knowledge of the plaintiff's contract with the third person. Third, that the outsider intentionally induced the third person not to perform his contract with the plaintiff. Fourth, that in so doing the outsider acted without justification. Fifth, that the outsider's act caused the plaintiff actual damages.

*Peoples Security Life Ins. Co. v. Hooks*, 367 S.E.2d 647, 649-50 (N.C. 1988) (internal quotation marks omitted). Here, the jury found that the Defendants had wrongfully interfered with a contract right between Edmondson and Mid-Ohio Race Track for 1995 worth $10,000. The jury found the same with respect to the Brainerd Race Track and the Road America Race Track.

The Defendants argue unconvincingly that insufficient evidence existed to support these findings. The evidence, viewed in the light most favorable to Edmondson, shows that after he had secured contractual commitments from these three track owners to run his new series, Cary Agajanian, Paradama's Chairman of the Board, directly contacted the Mid-Ohio Race Track's marketing manager and threatened to cancel other important contracts between the AMA and Paradama on the one hand and the Mid-Ohio Race Track on the other hand if it honored its contract with Edmondson. The record supports that the Mid-Ohio Race Track's cancellation in turn proximately caused cancellations by Road America and Brainerd. This evidence is sufficient to sustain the jury's verdict in favor of Edmondson on his tortious interference with contract claims.

## VI.

The AMA next challenges the district court's refusal to grant its motion for judgment as a matter of law or, in the alternative, for a new trial with respect to Edmondson's constructive fraud claim. In this regard, the AMA raises its *Broussard* argument again.

With respect to Edmondson's constructive fraud claim, the jury found that the AMA had a fiduciary duty to Edmondson from 1990 through 1994, that it breached that duty, and that the AMA did not act openly, fairly, and honestly with Edmondson. The jury found $100,000 in damages with respect to this claim. Edmondson based his constructive fraud claim on the AMA's actions in secretly withholding from him or unilaterally foregoing joint venture revenue from television coverage. According to Edmondson, he was due the money under the terms of the 1992 and 1993 JVAs.

This time, we agree with the AMA that *Broussard* bars the claim. Edmondson's claim is essentially one for breach of contract. He is alleging that the AMA failed to carry out promises that it made to him as part of the 1992 and 1993 JVAs. *Broussard* teaches that even if a breach of contract is intentional, it does no more than state a standard breach of contract claim. *See* 155 F.3d at 347. Based on *Broussard*, we vacate the judgment in favor of Edmondson with respect to his constructive fraud claim and remand the case to the district court with

instructions to enter judgment in favor of the AMA with respect to that claim.

## VII.

The Defendants rely on two grounds in contending the district court erred in denying their motion for judgment as a matter of law or in the alternative for a new trial with respect to Edmondson's § 75-1.1 claim. First, they contend Ohio law, which does not provide a parallel claim with treble damages, controls with respect to this claim. Second they reiterate their *Broussard* argument.

As the district court concluded, the choice of law issue should be resolved in favor of Edmondson. All parties properly agree that the choice of law rules of North Carolina, as the forum state, apply to determine which state's substantive law applies to Edmondson's claims. *See In re Nantahala Village, Inc.*, 976 F.2d 876, 880 (4th Cir. 1992). We have held that when the place of injury is open to debate in regard to an unfair trade practices claim, North Carolina choice of law rules require a court to apply the law of the state with the most significant relationship to the transaction. *See New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253, 255 (4th Cir. 1991). "Under the significant relationship test we consider where the relationship between the parties was created and where it was centered." *Id.*

In applying this test, the district court stated as follows:

The joint venture agreement provides it was entered into in Ohio. Plaintiff operated as a sole proprietor but AMA was an Ohio non-profit corporation. Plaintiff has always been a North Carolina resident and always operated his business from his North Carolina office. During the joint venture period, he also operated the joint venture from North Carolina. Plaintiff managed all classes of the races, including those of AMA, processed pre-entries, sold sponsorships, processed racing licences and collected entry fees and applications from his North Carolina office despite the fact that the races at issue occurred at various locations throughout the country. And, Plaintiff, a North Carolina resident has

been harmed by the conduct at issue. . . . The Court finds the North Carolina unfair trade practices statute should apply.

(J.A. 1842-43).

The Defendants argue that application of the significant relationship test results in the choice of Ohio substantive law. In this regard, the Defendants rely heavily on their assertion that all of Edmondson's claims arise out of the parties' joint venture relationship. They also rely on the fact that all of the joint venture agreements were entered into in Ohio and called for any issues of performance or construction under those agreements to be decided under Ohio law. We agree with the district court. The record supports the conclusion that North Carolina had a more significant relationship to this case than Ohio.

We next address the Defendants' argument that all of the conduct underlying Edmondson's § 75-1.1 claim merely states a breach of contract claim, and thus, under *Broussard*, is not actionable as a § 75-1.1 claim. We begin our analysis by setting forth the language and mechanics of a § 75-1.1 claim. Section 75-1.1 prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). Section 75-1.1 protects consumers as well as individual business persons. *See McDonald v. Scarboro*, 370 S.E.2d 680, 683 (N.C. Ct. App. 1988). Thus, disputes between competitors such as Edmondson and the Defendants fall under the province of § 75-1.1. *See McDonald*, 370 S.E.2d at 683.

In order to prevail on a § 75-1.1 claim, a plaintiff must show: (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) proximately causing actual injury to the plaintiff or the plaintiff's business. *See Spartan Leasing v. Pollard*, 400 S.E.2d 476, 460-61 (N.C. Ct. App. 1991). Based upon the jury's findings of fact, the court must determine as a matter of law whether a defendant's conduct violates § 75-1.1. *See McDonald*, 370 S.E.2d at 684. An act or practice is "unfair" within the meaning of § 75-1.1 "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 276 S.E.2d

397, 403 (N.C. 1981). An act or practice is "deceptive" within the meaning of § 75-1.1 when it has "the capacity or tendency to deceive." *Boyd v. Drum*, 501 S.E.2d 91, 96 (N.C. Ct. App. 1998) (internal quotation marks omitted), *aff'd*, 511 S.E.2d 304 (N.C. 1999). Finally, although no precise definition of the term "unfair methods of competition" exists,

> [u]nfair competition has been referred to in terms of conduct which a court of equity would consider unfair. Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others.

*McDonald*, 370 S.E.2d at 684 (internal quotation marks omitted). As the Defendants correctly point out, even an intentional breach of contract is not sufficiently unfair or deceptive to sustain an action under § 75-1.1. *See Broussard*, 155 F.3d at 347. Rather, if a breach of contract situation is at issue, substantial aggravating circumstances attending to the breach must be present. *See id.*

With respect to Edmondson's § 75-1.1 claim, the jury found the Defendants: (1) misrepresented to Edmondson their intention to purchase his interest in the joint venture; (2) failed to disclose to Edmondson the terms and/or nature of television coverage contracts for motorcycle races produced by the joint venture; (3) marketed and promoted professional motorcycle races in 1995 and/or thereafter as if those races were the same product which had been produced by the joint venture; (4) marketed and promoted professional motorcycle races in 1995 and/or thereafter as if those races were a continuation of the series operated by the joint venture prior to 1995; (5) interfered with actual and prospective contractual rights of Edmondson when he was attempting to carry on his new motorcycle racing business; and (6) asserted control over Edmondson's interest in the 1994 joint venture and/or excluded him from the business. Furthermore, the jury found that all of this conduct by the Defendants was in commerce or affected commerce and proximately caused injury to Edmondson. The district court concluded that all of this conduct constituted unfair and deceptive practices and unfair competition in or affecting commerce

in violation of § 75-1.1. Additionally, the district court held the same with respect to the Defendants' conversion of the Mailing List.

We first hold that *Broussard* precludes Edmondson from recovering under § 75-1.1 for the Defendants' failure to disclose the terms and/or nature of television coverage contracts for motorcycle races produced by the joint venture. This conduct involves nothing more than an intentional breach of one or more of the joint venture agreements.

We hold, however, that the balance of the jury's findings, including its finding that the Defendants converted the Mailing List, support a finding of liability for violations of § 75-1.1. Specifically, the Defendants' misrepresentations regarding their continued interest in purchasing Edmondson's business while at the same time secretly making and executing plans to take over his business constitutes an unfair and deceptive practice in or affecting commerce. *See Hardy v. Toler*, 218 S.E.2d 342, 347 (1975) (holding that used car salesman's misrepresentations to buyer that used car had only one owner, that remaining portion of original manufacturer's new car warranty could be transferred to buyer on payment of fee, and that automobile had not been involved in a wreck violated § 75-1.1); *First Atlantic Mgmt. Corp. v. Dunlea Realty Co.*, 507 S.E.2d 56, 64-65 (N.C. Ct. App. 2000). The conduct was certainly unethical and had the capacity and tendency to deceive. Indeed, based upon the Defendants' misrepresentations, Edmondson personally met with his sponsors, promoters, and the track owners with whom he did business in order to effectuate a smooth transition of the ownership of his business to the Defendants. Additionally, Edmondson worked with personnel of the Defendants to instruct them on the use of software and operational procedures of his business. The Defendants' misrepresentations preceded and went hand in hand with their assertion of control over the interest Edmondson held in the 1994 joint venture and/or excluding him from his business. The record shows that such interest primarily included the good will of his business, efficient operational procedures, and the Mailing List. Such conduct also constituted an unfair trade practice or method of competition in that it was oppressive, unethical, and clearly intended by the Defendants to take something for nothing. *See Drouilliard v. Keister Williams Newspaper Servs., Inc.*, 423 S.E.2d 324 (N.C. Ct. App. 1992) (conversion of confidential

customer list violated § 75-1.1). A *Broussard* problem does not exist here because the conduct at issue does not involve any obligations of the parties under the various joint venture agreements and the bulk of it occurred after the termination of the parties' joint venture relationship.

The Defendants' marketing and promotion of professional motorcycle races in 1995 and/or thereafter as if those races were the same product as and a continuation of the series operated by the joint venture prior to 1995 is a form of passing off. Such passing off is obviously an unfair method of competition in or affecting commerce. *See Harrington Mfg. Co., Inc. v. Powell Mfg. Co.*, 248 S.E.2d 739, 746 (N.C. Ct. App. 1978) (company's use of competitor's actual product in demonstrations to potential customers while at the same time falsely representing to potential customers that it had manufactured the product constituted an unfair method of competition within the purview of § 75-1.1). Again, no *Broussard* problem exists because the conduct at issue does not involve any rights or obligations under the consecutive joint venture agreements between the parties. Finally, the Defendants' conduct in interfering with Edmondson's contractual rights and prospective contractual rights when he was attempting to carry on his new business constitutes unfair competitive practice in or affecting commerce within the purview of § 75-1.1. *See McDonald*, 370 S.E.2d at 685 (holding that § 75-1.1 is applicable to tortious interference with contract situations); *Kewaunee Scientific Corp. v. Pegram*, 503 S.E.2d 417, 422 (N.C. Ct. App. 1998) (recognizing that interference with employment relations can be the basis for a violation of § 75-1.1). Indeed, the Defendants' pernicious threats to cancel business with track owners if they honored commitments to Edmondson effectively and unfairly doomed his attempt to start over in the business of running professional and semi-professional motorcycle races. *See Gray v. North Carolina Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000) ("[W]here a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice."). Again, we can discern no basis for *Broussard* to come into play here.

Having sifted through the multiple findings supporting the judgment in favor of Edmondson with respect to liability for his § 75-1.1 claim, we must next examine the damage award connected to the

claim. North Carolina General Statutes § 75-16 provides that if damages are assessed with respect to a § 75-1.1 claim, "judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict." N.C. Gen. Stat. § 75-16. The phrase "treble the amount fixed by the verdict" as found in § 75-16 provides only for the trebling of damages determined by the fact finder to be the proximate result of a § 75-1.1 violation. *See Gray*, 529 S.E.2d at 685. Should the same conduct give rise to a common law claim and a § 75-1.1 claim, the plaintiff may recover damages for either claim, but not for both. *See United Laboratories, Inc. v. Kuykendall*, 437 S.E.2d 374, 379 (N.C. 1993).

Here, Edmondson elected to recover damages for his § 75-1.1 claim. Based upon this election, the district court entered judgment in favor of Edmondson for $2,790,000, plus pre and post judgment interest. Believing the conduct underlying all of Edmondson's common law claims paralleled the conduct underlying his § 75-1.1 claim, the district court arrived at the $2,790,000 figure by trebling the amount of actual damages the jury awarded with respect to Edmondson's common law claims.

We first hold the judgment must be reduced by $300,000, which represents the trebled amount of the jury's award with respect to the Defendants' failure to disclose the terms and/or nature of television coverage contracts. We, therefore, vacate the portion of the judgment awarding Edmondson $300,000 as damages for the Defendants' failure to disclose the terms and/or nature of television coverage contracts for motorcycle races produced by the joint venture. This leaves a balance of $2,490,000. Of this amount, we are troubled by the $750,000 the district court presumed the jury found as damages flowing from the Defendants' "[a]ssert[ion] of control over [Edmondson's] interest in the 1994 joint venture and/or exclu[sion of] him from the business." (J.A. 1723). The jury never actually made a damages finding with respect to this conduct. The closest it came to such a finding was the finding it made as a result of the district court's flawed instructions regarding Edmondson's common law claim for conversion of the business assets that he brought to the 1994 joint venture. In light of the flawed instructions and the large sum of money at stake, we are not comfortable allowing the statutory trebling of the $750,000 to stand. Accordingly, we vacate this portion of the

judgment in favor of Edmondson and remand for a new trial on damages in order for the jury to make a specific finding regarding the damages flowing from Defendants' "[a]ssert[ion] of control over [Edmondson's] interest in the 1994 joint venture and/or exclu[sion of] him from the business." (J.A. 1723). Of course, such damages may include, subject to proof, those damages flowing from Edmondson's loss of intangible business assets such as business expectancies and goodwill. This leaves the remaining balance of the judgment at $240,000, which we are comfortable is amply supported by the evidence, and of which the jury made specific findings. Accordingly, we affirm this portion of the judgment in favor of Edmondson.

## VIII.

Finally, we must address some loose ends created by our disturbance of the final judgment. Our vacature of Edmondson's common law constructive fraud claim and conversion claim pertaining to the business assets that he contributed to the 1994 joint venture necessitates that we vacate the jury's finding of punitive damages and remand for a new trial on that issue. Additionally, given our partial disturbance of the district court's judgment with respect to Edmondson's § 75-1.1 claim, we vacate the district court's attorneys' fees/disbursements award in favor of Edmondson, which it made pursuant North Carolina General Statutes § 75-16.1. We direct the district court to reconsider Edmondson's motion for attorneys' fees and disbursements pursuant to § 75-16.1 following the conclusion of all proceedings on remand and express no opinion on the merits of the motion. We have reviewed all other assignments of error urged by the Defendants and find them to be without merit.

## IX.

In conclusion, we: (1) affirm the judgment with respect to Edmondson's conversion claim pertaining to the Mailing List; (2) vacate the judgment with respect to Edmondson's claim for conversion of his business assets and interests that he brought to the 1994 joint venture and remand for a new trial with proper instructions outlined in Part IV of this opinion; (3) affirm the judgment with respect to Edmondson's claim alleging tortious interference with contracts; (4) vacate the judgment in favor of Edmondson with respect to his

constructive fraud claim and remand with instructions that the district court enter judgment in favor of the AMA with respect to that claim; (5) vacate the judgment as it pertains to the district court's conclusion that the Defendants' failure to disclose the terms and/or nature of television coverage contracts for motorcycle races produced by the joint venture violated § 75-1.1; (6) affirm the liability portion of the judgment in favor of Edmondson with respect to the balance of the Defendants' conduct the district court concluded violated § 75-1.1; (7) affirm the portion of the judgment allowing Edmondson to recover the trebled amounts of his actual damages flowing from the Defendants' violations of § 75-1.1 in connection with their conversion of the Mailing List and tortious interference with Edmondson's actual and prospective contractual rights; (8) vacate the portion of the judgment allowing Edmondson to recover the trebled amount of damages the district court presumed the jury found with respect to the Defendants' exclusion of Edmondson from his business and remand for a new trial on damages as to that issue; (9) vacate the punitive damages award and remand for a retrial on that issue; and (10) vacate the award for attorneys' fees and disbursements and remand for the district court to reconsider Edmondson's motion for attorneys' fees and disbursements at the conclusion of all other proceedings on remand.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*